**M. C. WEST, INC., et al., Plaintiffs,**

v.

**Andrew L. LEWIS, Jr., Secretary, United States Department of Transportation et al., Defendants.**

No. 80–1049.

United States District Court,
M. D. Tennessee,
Columbia Division.

Aug. 24, 1981.

Edward C. Blank, II, N. Houston Parks, Columbia, Tenn., for plaintiffs.

Hal D. Hardin, U. S. Atty., William M. Leech, Jr., State Atty. Gen., Donald L. Corlew, Deputy Atty. Gen., Nashville, Tenn., M. Taylor Aspinwall, U. S. Dept. of Justice, Civ. Rights Div., Kenneth N. Weinstein, U. S. Dept. of Transp., Washington, D. C., Richard S. Ugelow, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

### MEMORANDUM

WISEMAN, District Judge.

Plaintiffs, highway construction contractors, claim that Department of Transportation regulations, which provide for use of Minority Business Enterprise [MBE] contract goals, 49 C.F.R. § 23.45 as amended on April 27, 1981, violate their constitutional rights to due process and equal protection under the fifth and fourteenth amendments and their statutory rights under 23 U.S.C. § 112 (1976), 42 U.S.C. § 1983, (Supp. III 1979) and 42 U.S.C. § 2000d (1976). Plaintiffs seek a preliminary injunction against federal and state officials to restrain them from enforcing the Department of Transportation's regulations and a declaratory judgment that the regulations are unconstitutional. This Court has jurisdiction under 28 U.S.C. § 1331.

The case was filed on December 15, 1980. By stipulation and order on March 9, 1981, the parties agreed to delay hearing of the preliminary injunction request until after the Secretary of Transportation finished revising the challenged regulations;[1] this Court is now concerned only with the regulations as amended on April 27, 1981.

The amended regulation, in pertinent part, provides as follows:

(h) *A means to ensure that competitors make good faith efforts to meet MBE*[2] *contract goals*:

(1) For all contracts for which contract goals have been established, the recipient [3] shall, in the solicitation, inform competitors that the apparent successful competitor will be required to submit MBE participation information to the recipient and that the award of the contract will be conditioned upon satisfaction of the requirements established by the recipient pursuant to this subsection.

(i) The apparent successful competitor's submission shall include the following information:

(A) The names and addresses of MBE firms that will participate in the contract;

(B) A description of the work each named MBE firm will perform;

(C) The dollar amount of participation by each named MBE firm.

. . . .

(II) The recipient may select the time at which it requires MBE information to be submitted. *Provided*, that the time of submission shall be before the recipient

---

1. Under the old regulation, if a firm met the goals set by the recipient (usually the state), it was conclusively presumed that all who failed to meet the goal had failed to exert sufficient reasonable efforts to hire MBEs. Absent sufficient hiring or efforts to hire MBEs a contract could not be awarded. The "conclusive presumption" met with massive opposition among nonminority contractors. *See* 46 Fed.Reg. 23458 (April 27, 1981). The removal of the presumption, according to the Government, resulted in the settlement of all cases challenging this regulation except the instant case.

2. Minority business enterprise is defined as "a small business concern, as defined pursuant [*sic*] to section 3 of the Small Business Act and implementing regulations, which is owned and controlled by one or more minorities or wom-

en." 49 C.F.R. § 23.5. Under this definition "owned and controlled" means a business:

(a) which is at least 51 per centum owned by one or more minorities or women or, in the case of a publicly owned business, at least 51 per centum of the stock of which is owned by one or more minorities or women; and
(b) whose management and daily business operations are controlled by one or more such individuals.
*Id.*

3. " 'Recipient' means any entity, public or private, to whom DOT financial assistance is extended, directly or through another recipient for any program."
*Id.*

commits itself to the performance of the contract by the apparent successful competitor.

(2) If the MBE participation submitted in response to paragraph (h)(1) of this section does not meet the MBE contract goals, the apparent successful competitor shall satisfy the recipient that the competitor has made good faith efforts to meet the goals.

. . . .

(3) Meeting MBE contract goals, making good faith efforts as provided in paragraph (h)(2) of this section, or meeting requirements established by recipients in lieu of good faith efforts, is a condition of receiving a DOT-assisted contract for which contract goals have been established.

46 Fed.Reg. 23461 (April 27, 1981), amending 49 C.F.R. § 23.45 (1980) (emphasis in original).

In the appendix to the amended regulation, the Secretary attempts to provide guidance concerning the achievement of good faith efforts. "Efforts that are merely *pro forma* are not good faith efforts to meet the goals. Efforts to obtain MBE participation are not good faith efforts to meet the goals, even if they are sincerely motivated, if, given all the circumstances, they could not reasonably be expected to produce a level of participation sufficient to meet the goals." 46 Fed.Reg. 23461 (April 27, 1981).

During the hearing held by this Court on plaintiffs' motion for a preliminary injunction, the Court tried to determine what would be considered good faith efforts. The parties were unable to agree who determined whether good faith efforts had been made. The Government said that the recipient made the sole determination. The recipient, here the State of Tennessee, acknowledged that it may be the formal decision maker, but recognized that a federal agency would be looking over their shoulder.

In any event the Department includes in its appendix a list of efforts that recipients may consider as evidence of good faith compliance. Some of the efforts include attendance at presolicitation or prebid meetings; advertisement in minority-focus media; written notice to specific MBEs; follow-ups after initial solicitations of MBEs; provision of adequate information to MBEs; good faith negotiation with interested MBEs; assistance in obtaining bonding, credit, or insurance for MBEs; and use of available minority community organizations and the like in the recruitment and placement of MBEs. *Id.* at 23461–62.[4] The contract goals for Tennessee highway projects, which were set by the Atlanta Regional Administrator, are two and one-half percent for MBEs and one percent for WBEs.

Plaintiffs have moved for a preliminary injunction. In determining whether a preliminary injunction should be granted " 'no single factor is determinative.' " *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978) *cert. dismissed* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979) (quoting *Metropolitan Detroit Plumbing and Mechanical Contractors Association v. HEW*, 418 F.Supp. 585, 586 (E.D.Mich. 1976)).

In addition to assessing [1] the likelihood of success on the merits, the court must consider [2] the irreparability of any harm to the plaintiff, [3] the balance of any injury as between the parties, and [4] the impact of the ruling on the public interest. In general the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.

*Id.* at 537–38.

### Irreparable Harm

Defendants assert that plaintiffs have not shown that enforcement of the regula-

---

4. The Secretary's regulations also prohibit discrimination.

No person shall be excluded from participation in, denied benefits of, or otherwise discriminated against in connection with the award and performance of any contract covered by this Part, on the grounds of race, color, national origin, or sex.

49 C.F.R. § 23.7 (1980).

tions will cause irreparable injury during the pendency of this litigation. To be sure, plaintiffs have been unable to prove that any contracts were awarded to a contractor other than the low bidder because of the MBE regulations.[5]

■ Plaintiffs most basic claim is that their rights to equal protection of the laws have been violated by these regulations. In a case challenging the former, more stringent regulations the district judge held that equal protection rights are "so fundamental to our legal system and to our society that any violation thereof will cause irreparable harm irrespective of the financial impact." *Central Alabama Paving, Inc. v. James*, 499 F.Supp. 629, 639 (M.D.Ala.1980). This Court is in complete agreement with that approach and therefore no further inquiry into the financial effect of the regulations is necessary.

*Likelihood of Success on the Merits*

■ Plaintiffs claim that the regulations violate the competitive bidding requirement of the Federal Highway Act, 23 U.S.C. § 112(b), which provides that "[c]ontracts for the construction of each project shall be awarded only on the basis of the lowest *responsive* bid submitted by a bidder meeting established criteria of responsibility." *Id.* (emphasis added). Because the Secretary's regulations are in themselves definitions of responsiveness, plaintiffs' challenge to the regulations as violative of this statute is without merit. *See Central Alabama Paving, Inc. v. James, supra,* at 633.

Plaintiffs challenge the Secretary's regulations under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. In *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750

(1978), four Justices of the Supreme Court opined that the affirmative action plan at the Davis Medical School violated Title VI because it clearly prohibits discrimination on the grounds of race, color, or national origin under any program receiving federal financial assistance. *Id.* at 408–421, 98 S.Ct. at 2808–2815, 57 L.Ed.2d 845–53. Five of the Justices, however, believed that Title VI and the equal protection clause were coextensive. *Id.* at 283, 325, 98 S.Ct. at 2744, 2766, 57 L.Ed.2d at 766–67, 793. Therefore, this Court will review the remainder of plaintiffs' challenge under constitutional standards.[6]

In *Bakke, supra,* the Court struck the medical school's special admissions program, but held that race could be considered in the admissions process. The admissions program was held unlawful as a result of four Justices opinion that Title VI of the Civil Rights Act of 1964 was violated and Justice Powell's opinion that the process violated the equal protection clause of the fourteenth amendment. According to Justice Powell, race can be considered in admissions programs that were tailored to remedy present effects of past discrimination. *Id.* at 299, 307, 98 S.Ct. at 2752–53, 2757, 57 L.Ed.2d at 777, 782. The medical school's program, however, had not undertaken to correct the effects of specific, identified discrimination; countering the effects of "societal discrimination" was the goal. 438 U.S. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d at 782.

The State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination. . . . [The] goal [in the school desegregation cases] was far more focused than the remedying of the effects of "so-

---

5. In the most recent letting, May of 1981, plaintiffs contend that C.H. & O., Inc. lost its bid because the State was informed by federal officials that the bid was not responsive. The State official conceded on cross-examination, however, that in his opinion the low bidder on that letting did not answer the federal officials' complaints because it wanted out of the contract. According to the State official, the unresponsiveness of the lowest May letting bid was

a result of the contractor's setting his bid too low, rather than any impact of the MBE regulations.

6. The due process clause of the fifth amendment has been held to embody the concept of equal protection as written in the fourteenth amendment. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

cietal discrimination," an amorphous concept of injury that may be ageless in its reach into the past.

We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals *in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations....* Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interests in helping one individual than in refraining from harming another.

*Id.* at 307–309, 98 S.Ct. at 2757–2758, 57 L.Ed.2d. at 782–783 (footnote and citations omitted and emphasis added). Absent such findings, the program could not withstand strict scrutiny because the state had no compelling justification for the different treatment. *Id.* at 291, 300–319, 98 S.Ct. at 2748–49, 2753–2763, 57 L.Ed.2d at 771, 777–789.

Four other Justices concluded that the affirmative action program satisfied the equal protection clause. The measure was undoubtedly designed to remedy the present effects of past societal discrimination and the school's decision that minority underrepresentation was important and should have been cured justifies the use of the program. *Id.* at 324–379, 98 S.Ct. at 2765–2794, 57 L.Ed.2d at 792–827 (Brennan, J., joined by White, Marshall, and Blackmun, JJ.).

In 1980, the Supreme Court upheld a congressionally enacted ten percent set-aside for MBEs in federally funded public works projects. *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Again, no one opinion spoke for a majority of the Court. A clear plurality of the Court, however, would require precise findings of discrimination before allowing an affirmative action program to stand. Chief Justice Burger and Justices Powell, White, and Stevens would all require some proof of past discrimination. 448 U.S. at 474–479, 100 S.Ct. at 2773–75, 65 L.Ed.2d at 922–24 (Burger, C. J., with Powell and

White, JJ., concurring); *id.* 448 U.S. at 496–506, 100 S.Ct. 2784–2789, at 936–42 (Powell, J., concurring); *id.* 448 U.S. at 537–547, 100 S.Ct. at 2805–2810, at 962–968 (Stevens, J., dissenting). Two Justices were of the opinion that the equal protection clause absolutely prohibits any statutory classification based on race. 448 U.S. at 522, 100 S.Ct. 2798, 65 L.Ed.2d at 953 (Stewart, J., joined by Rehnquist, J., dissenting). The three remaining justices found the set-aside valid because it served important governmental objectives and was substantially related to achievement of those objectives. 448 U.S. at 519, 100 S.Ct. at 2796, 65 L.Ed.2d at 951 (Marshall, J., joined by Brennan and Blackmun, JJ.).

The MBE provision at issue in *Fullilove* was part of the Public Works Employment Act of 1977. The purpose of the provision was to bring federally assisted public works contracts into the minority business community. In the Act, Congress specified a limited racial and ethnic preference in the expenditure of federal funds. The 1975 report of the Subcommittee on SBA Oversight and Minority Enterprise stated that " 'the effects of past inequities stemming from racial prejudices have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system.' " 448 U.S. at 465, 100 S.Ct. at 2768, 65 L.Ed.2d at 916 (quoting H.R.Rep.No.94–468, 1–2 (1975)). The ten percent set aside in the Public Works Employment Act of 1977 was enacted to help remedy the effects of prior discrimination. *See* 122 Cong.Rec. H5327–31 (1977).

The Government initially argues that the good-faith efforts requirement is not preferential. Obviously, the requirement is not as inflexible as the quota system struck in *Bakke* or the ten percent set-aside system upheld in *Fullilove.* No firm is required to hire MBEs under the DOT's regulations, only good-faith efforts must be undertaken to hire MBEs. Moreover, the Government argues, the regulations are not even intended to be remedial; the Secretary's regula-

tions in this case are valid as an exercise of his executive duties.

The assertion that these regulations are not remedial is made because of the dearth of specific legislative authority. The Government also argues that specific legislative authority is unnecessary because of the extensive congressional recognition of discrimination against minorities, particularly in the construction industry. Of these two arguments the latter is more persuasive.

The setting of goals and standards for compliance, be they compulsory or good faith standards, for the expenditure of federal funds to the benefit of a certain group of individuals is a preference. Seven Justices of the Supreme Court recognized in *Fullilove* that preferences based on race or ethnicity may be legal under certain circumstances. Therefore, the issue is whether the preference in this case meets those conditions.

Justices Brennan, Marshall, and Blackmun would uphold the preference in this case if it is substantially related to the achievement of the important and congressionally articulated goal of remedying present effects of past discrimination. In *Bakke* these Justices and Justice White were satisfied with the determination by a medical school of past societal discrimination was sufficient to hold a precise quota constitutional. In the instant case a federal agency has established a much less intrusive goal—requiring the use of best efforts is not as discriminatory as the setting aside of sixteen seats out of a hundred. Its definition of the unit—MBEs—is based on other federal legislation, e. g., Public Works Employment Act of 1977, Pub.L. No. 95–28, 91 Stat. 116 (1977), *codified at* 42 U.S.C. § 6701 *et seq.*; Small Business Act of 1958, Pub.L. No. 85–536, § 2(8), 72 Stat. 389 (1958), *codified at* 15 U.S.C. § 631 *et seq.* As a policy of the federal government similar affirmative action programs (over one hundred) are used by many federal agencies with and without supporting congressional legislation.

Initially, the question is whether the enabling legislation is sufficient to grant the Secretary authority to promulgate this type of regulation. Whether these bases are sufficient to support the constitutionality of the Secretary's goals depends upon how specific the findings need be in support of the rule. Obviously, the findings in this case would not be sufficient for Justice Stevens, for he found that the legislative history of the Public Works Employment Act of 1977 was not sufficient to support the MBE type of classification used in *Fullilove.*

In *Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629 (M.D.Ala.1980), the district court, in refusing to uphold the constitutionality of the Secretary of Transportation's conclusive presumption rule, read *Fullilove* as requiring express congressional authorization for racially preferential regulations. Not only must the agency have congressional authorization, but the agency "must have made findings of past discrimination and have determined that its actions are responsive to that discrimination," 499 F.Supp. at 636, in order for the regulation to be constitutional. The district court's primary reliance was on the Supreme Court's decision in *Fullilove.*

According to the *Central Alabama* court, only Congress may authorize race conscious remedies for past discrimination. *Fullilove* does not render the executive or judicial branches powerless to remedy past wrongs, however. Clearly, Congress is the lawmaking body under our Constitution, and its power is preeminent in the legislative field. U.S.Const. Art. I. Courts, too, may correct injustice by ordering a race-conscious remedy. *See North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586, 589 (1971); *United States v. Local 212, IBEW,* 472 F.2d 634 (6th Cir. 1973). Although the executive is not a lawmaking or an adjudicatory body, it is charged with the duty to fairly execute the laws. U.S.Const. Art. II. To analyze the executive's power, the Court looks to Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952):

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. . . .

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 635–638, 72 S.Ct. at 870–71, 96 L.Ed.2d at 1199–1200 (Jackson, J., concurring) (footnotes omitted).

The Government argues that the regulations are consistent with Executive Order 11,246, which requires that a contractor agree

not [to] discriminate against any employee or applicant . . . because of race, color, or religion, sex, or national origin [and to] take affirmative action to ensure that applicants are employed . . . without regard to their race, color, religion, sex, or national origin.

Exec. Order No. 11,246 § 202(1). Under section 301 of Executive Order 11,246, each executive agency must require that an applicant incorporate the provisions of section 202 of the Order in its contract.

In *Contractors Association v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), the court upheld the Philadelphia Plan of affirmative action that required all bidders to set goals for minority hiring consistent with the percentages in the Plan. The court held that 11,246 fell within Justice Jackson's first two categories. *Id.* at 170–71.

The Philadelphia Plan was the result of a congressional appropriation for federally assisted construction. The Secretary of Labor had devised the scheme for letting the contracts that required racial and ethnic goals. The Third Circuit found the congressional appropriation of funds significant.

When the Congress authorizes an appropriation for a program of federal assistance, and authorizes the Executive branch to implement the program . . ., in the absence of specific statutory regulations it must be deemed to have granted to the President a general authority to act for the protection of federal interests.

*Id.* at 171.[7] The court went on to hold the order undisturbed by Titles VI or VII of the Civil Rights Act of 1964. To hold that the Plan violated the civil rights laws, the court said, would attribute to Congress the intent to maintain the "status quo and to foreclose remedial action . . . designed to overcome existing evils." *Id.* at 173. The Plan withstood the plaintiffs' equal protection challenge as well. *See id.* at 176–77.

7. *See* Comment, *The Philadelphia Plan: A Study in the Dynamics of Executive Power,* 39 U. of Chi.L.Rev. 723, 750 (1972) (criticizing concept of ratification by appropriation).

*See also United States v. Local 212, IBEW,* 472 F.2d 634 (6th Cir. 1973) (upheld court ordered racially preferential hiring program against due process, equal protection, and Civil Rights Act challenges).

The authority for the Secretary's action in this case, however, does not derive its source directly from Executive Order 11,246. Authority to issue rules and regulations is vested in the Secretary of Labor, who is responsible for enforcement of the Order generally. Exec. Order No. 11,246 § 201. The Government has not cited any regulation of the Secretary of Labor conferring authority on the Secretary of Transportation. Moreover, the Secretary of Transportation did not rely on 11,246 for authorization. At the conclusion of the Transportation Department regulations, Secretary Lewis cites five statutes and two executive orders. 46 Fed.Reg. 23462 (April 27, 1981).

The Secretary lists the following statutes after the new regulation:

1. Title VI of the Civil Rights Act of 1964; 42 U.S.C. § 2000d.

2. Section 30 of the Airport and Airway Development Act of 1970, as amended; 49 U.S.C. § 1730.

3. Section 905 of the Railroad Revitalization and Regulatory Reform Act of 1976 (section 906 appears to be the appropriate section; it is codified at 49 U.S.C. § 1657a).

4. Section 19 of the Urban Mass Transportation Act of 1964, as amended; 49 U.S.C. § 1615.

5. 23 U.S.C. 324.

■ This Court has difficulty construing the language of Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the ground of race, color, or national origin under any federally assisted program, into compulsory language that requires race-conscious federal assistance. Although the Philadelphia Plan court's ad-

monition that Congress did not preserve the status quo is well taken, this Court would have to conclude, absent other more specifically mandatory authority for remedial preferences, either through direct legislation or executive orders, that Title VI would not support a racially preferential federal assistance project.

■ Pursuant to section 602 of Title VI, 42 U.S.C. § 2000d–1, agencies may take action to effect compliance with Title VI, 42 U.S.C. § 2000d. Because of the facial neutrality of Title VI, however, race-conscious administrative regulations cannot be based on Title VI alone. In *Fullilove, supra,* the Supreme Court looked for more specific legislation than the Civil Rights Act of 1964 to uphold the race-conscious law. Similarly, if this Court had to decide the instant case on the basis of Title VI, sections 601 and 602, the regulation would not survive. The language of Title VI does not specifically call for affirmative action. Although the findings of pervasive nationwide discrimination gave rise to the Civil Rights Act of 1964, other more specific legislative, executive, or administrative action is required to satisfy *Fullilove.*[8] The tendency to turn the language of laws that require racial neutrality—thou-shalt-not-discriminate laws—into authority for granting racial preference is twisting the plain meaning of statutes too far. In a different era a similar jurisprudential approach could turn the same laws into weapons in the hands of persecutors. The present judicial approach begun by Justice Powell in *Bakke* and strengthened in *Fullilove* allows dissimilar treatment when one branch of government has determined that a certain group has suffered from prior wrongdoing and deserves aid and rehabilitation. The checks and balances of our system of government should prevent incorrect determinations. An administrative agency, although part of the emerging fourth branch, cannot act on its own with-

---

8. The request for a preliminary injunction was granted in the *Central Alabama* case partly because the Attorney General had not approved of the regulation as required by section 602 of Title VI. Pursuant to that section the

President's designee, the Attorney General, *see* Exec. Order 12,250 (1980), approved and concurred in the regulations as implementations of Title VI of the Civil Rights Act of 1964. Statement of Attorney General Smith, July 17, 1981.

out express congressional authority or express executive authority not in conflict with Congress. As the Supreme Court held in *Fullilove*, neither Title VI nor the equal protection aspect of the fifth amendment prohibit these actions taken by the Government to correct prior injustice.

▪ Of the other four statutes relied on by the Secretary, none are specific enough to authorize the agency's action in this case. The regulations in this case involve federally assisted highway projects, not airport development, railroad revitalization, or mass transit. The only statute that pertains to the highway program is 23 U.S.C. § 324, but it merely prohibits discrimination on account of sex.[9] The Secretary's regulations extend to benefit more than those discriminated on account of sex.

A more direct line of authority for the Secretary's regulations comes through the Small Business Act and the President's Executive Orders issued pursuant thereto. Congressionally declared policy of the Small Business Act satisfies the concerns of the Powell wing of the *Fullilove* Court in that the effects of past discrimination were found to affect minorities adversely in their ability to participate in our free enterprise system. 15 U.S.C. § 631(e)(1)(A)–(G).[10]

Executive Order 11,625 established the National Program for Minority Business Enterprise. The Order is consistent with the congressional policy expressed in the Small Business Act. Executive Order 11,625 empowers the Secretary of Commerce to "[c]oordinate ... the plans, programs, and operations of the Federal Government which affect or may contribute to the establishment, preservation, and strengthening of minority business enterprise." Exec. Order No. 11,625 § 1(a)(1) (1971), *reprinted in* 15 U.S.C. § 631. The Order spoke directly to each federal department and agency, commanding them to "continue all current efforts to foster and promote minority business enterprises and to support the program [in the Order], and [to] cooperate with the Secretary of Commerce in increasing the total Federal effort." *Id.* at § 3(e). When Executive Order 11,625 was reconsidered in 1977, this section was left undisturbed. *See* Executive Order No. 12,007, 42 Fed.Reg. 42839 (Aug. 22, 1977).

The chain of authority is not pristine. The declaration of policy in the Small Business Act refers simply to procurement by the Government of "articles, equipment, supplies, services, materials, and construc-

9. No person shall on the ground of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance under this title or carried on under this title. This provision will be enforced through agency provisions and rules similar to those already established, with respect to racial and other discrimination, under title VI of the Civil Rights Act of 1964. However, this remedy is not exclusive and will not prejudice or cut off any other legal remedies available to a discriminatee.
23 U.S.C. § 324 (1973).

10. (A) that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy;
(B) that many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control;

(C) that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans and other minorities;
(D) that it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups;
(E) that such conditions can be improved by providing the maximum practicable opportunity for the development of small business concerns owned by members of socially and economically disadvantaged groups;
(F) that such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from such concerns; and
(G) that such procurements also benefit the United States by encouraging the expansion of suppliers for such procurements, thereby encouraging competition among such suppliers and promoting economy in such procurements.
15 U.S.C. § 631 (1976).

tion work." 15 U.S.C. § 631(e)(1)(F). The Transportation Department regulations in this case concern federally assisted highway projects. Federal assistance and procurement programs differ in their purpose. *But see* 46 Fed.Reg. 23459 (April 27, 1981) (Transportation Secretary's textual analysis of the regulations at issue in this case refers to program functions as procurements). In procurement the Government obtains what it needs to provide government services. Federal assistance, on the other hand, is a government service. When the Government exercises its procurement function with the purpose of remedying discrimination against minorities, however, it is more like a program of federal assistance than pure procurement. Moreover, no congressional statement suggests that·the President cannot apply congressional policies made in the procurement context to federal assistance programs. In fact, Congress has adopted a strict minority quota system and a federal assistance program that involves the construction industry, and the constitutionality of this system has been upheld by the Supreme Court. *Fullilove v. Klutznick, supra,* (the Public Works Employment Act of 1977; 42 U.S.C. § 6705(f)(1)(A)).

██ The MBE and WBE programs of the Secretary of Transportation are valid efforts to promote minority businesses. Congress has found that minority businesses are in need of remedial assistance, 15 U.S.C. § 631, particularly in the construction industry, 42 U.S.C. § 6705(f)(1)(A); 122 Cong. Rec. H5327–31 (1977) (remarks of Representatives Mitchell, Roe, and Biaggi); *id.* at S7156 (remarks of Senator Brooke). The President has enlisted the departments to promote these congressional goals. Exec. Order No. 11,625; Exec. Order No. 11,246. The Secretary of Transportation is required by statute to award the contract to the "lowest responsive bid[der]." 23 U.S.C. § 112. The Secretary's regulations in response to the remedial goals set by Congress and the President has defined a responsive bidder as one that has met MBE

and WBE contracting goals or has tried in good faith to meet them.

The Secretary's goals for WBEs, one percent in Tennessee, are grounded on even firmer soil. Executive Order 12,138 requires "[e]ach department . . . [to] take appropriate action to facilitate, preserve and strengthen women's business enterprise and to ensure participation by women in the free enterprise system." 44 Fed.Reg. 29637 (1979), *reprinted in* 5 U.S.C. § 631. The Order goes on to expressly authorize affirmative action in support of WBEs.

Plaintiffs assert that any race-conscious action taken respecting Tennessee contractors would be unconstitutional because no findings were made with regard to discrimination by Tennessee contractors. This argument is based on Justice Powell's *Bakke* opinion in which he struck the medical school admissions program. This race-conscious aspect may have survived attack had it been supported by findings of past discrimination. The *Fullilove* decision is consistent; prior discrimination must have·existed to justify present remedial efforts. Notably, however, no specific findings were made in *Fullilove.* Committee reports and the statements of congressmen constituted the finding aspect of the decision.

██ The Secretary of Transportation amended the rule in response to comments received from nearly 400 sources. The contracting public was disturbed by the former rules and urged their reconsideration. The rules, as amended, although not the result of an adjudicatory fact finding process, are the result of the Notice and Comment adversary-like process, and this is sufficient for an agency to make findings in support of its rule changes.[11]

In *Central Alabama,* the *Fullilove* case was held inapplicable because the agency had not found as fact discrimination against minorities.

> The governmental body must find past discrimination and make a determination that its proposed race or sex conscious

---

11. Although a shortened comment period was used, *see* 46 Fed.Reg. 23458 (April 27, 1981),

plaintiffs do not challenge the rule on this basis.

program addresses that illegal discrimination. Thus, even if DOT should prevail on the question of whether it has the authority to issue this type of regulation, it must also show that it determined prior to the enactment of the regulation that discrimination against the minority groups favored under its rule had occurred and that the regulation in question was designed to eliminate the effects of that discrimination. *Central Alabama Paving, Inc. v. James, supra,* at 638. Findings as specific as required by the *Central Alabama* court were not available in *Fullilove.* The findings of Congress regarding the Public Works Employment Act of 1977 were at least broad enough to support ameliorative regulations in the construction industry, especially when coupled with the declaration of policy in the SBA.[12] The remedy in this case is extremely narrow in application. Little coercion is involved.[13]

As Justice Powell said in *Bakke* "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." 438 U.S. at 291, 98 S.Ct. at 2748, 57 L.Ed.2d at 771. The Government must have a permissible and substantial purpose or interest in the classification, and its use must be " 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." 438 U.S. at 305, 98 S.Ct. at 2756, 57 L.Ed.2d at 781 (quoting *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2854–55, 37 L.Ed.2d 910 (1973)).[14]

The substantiality of the Government's interest is demonstrated by the existence of numerous government programs that were devised to remedy past wrongs, and that assist in the creation and continuation of minority businesses. *See* Guide to Federal Assistance Programs for Minority Business Development, U.S. Dept. of Commerce (1980) (over 140 minority assistance programs exist). The regulations of the Secretary of Transportation embody a permissible governmental purpose or interest in remedying the dire effects of past discrimination. As discussed above, legislative or executive findings of discrimination permit the judiciary to uphold the remedy employed so long as the remedy is narrowly tailored to alleviate the wrong without intruding excessively on the rights of others. Congress has found that racial, ethnic, and sex discrimination has adversely affected minorities in the construction industry. *See* Public Works Employment Act of 1977; 42 U.S.C. § 6705(f)(1)(A). The President has implemented remedial action in the procurement and federal assistance policies of the government. Exec. Order Nos. 11,625, 11,246. The Transportation Secretary's regulation is narrowly tailored to effect the remedial action with the least possible intrusion on nonminority contractors.

Admittedly, the Secretary's regulation does not fit neatly into the constitutional analysis that flows from the three very different judicial approaches espoused by members of the Supreme Court. In *Fullilove,* the race-conscious remedy was upheld

---

12. *See* note 10 *supra.*

13. The Court is concerned that because of the pressure brought against the former regulation the present rule was adopted without consideration of whether it would do any good. During the consideration of the Public Works Employment Act of 1977, Senator Brooke expressed dismay with the good-faith test:

   This amendment [requiring ten percent of the appropriation to be set aside for minority businesses] provides a rule-of-thumb which requires much more than the vague "good-faith efforts" language which currently hampers our efforts to ensure minority participation.

   122 Cong.Rec. S7156 (1977). Thus, the regulation may not be strict enough to remedy past

discrimination. This Court must recognize, however, the significance of political action that influences the government. Decisions that have sifted through the political process—legislative or administrative—are entitled to more respect than spontaneous, nondebated rules. That is why findings under even an abbreviated period of the Notice and Comment provisions of the Administrative Procedure Act must be upheld against an improper-tailoring argument.

14. Justice Powell was the only Justice to apply strict scrutiny in *Bakke.* In *Fullilove,* Chief Justice Burger and Justices Stewart, White, Powell, Rehnquist, and Stevens applied some sort of strict scrutiny with different results.

because it was designed and enacted by Congress. The race-conscious action in *Bakke* was struck because the race-consciousness was not based on any identifiable finding of necessity. At bottom in *Bakke* may have been the unfairness of nonindividualized treatment. 438 U.S. at 319 n.53, 98 S.Ct. at 2763 n.53, 57 L.Ed.2d at 789 n.53. *See* L. Tribe, *Perspectives on* Bakke: *Equal Protection, Procedural Fairness, or Structural Justice?*, 92 Harv.L.Rev. 864, 867–73 (1979).

The instant regulation is procedurally fair insofar as the burden on the nonminority businesses is not severe. Under the Davis Medical School admissions program, Alan Bakke, an applicant with excellent grades and test scores, was denied admission simply because he was white. In the instant case, the goal of bringing minorities into the construction industry can be accomplished by requiring the companies to try to contract with minority businesses. This works no substantial unfairness on those companies. No firm is totally foreclosed from obtaining federally assisted contracts as long as good faith efforts are made to obtain MBEs. *See* 438 U.S. at 305, 98 S.Ct. at 2756, 57 L.Ed.2d at 781. No contracts have been lost by firms unable to find sufficient MBEs.

The regulations before the Court seem to have more characteristics similar to the *Fullilove* statute and regulations than the admissions program in *Bakke*. Congress and the President have recognized that action must be taken to remedy the present effects of past discrimination, particularly in the construction industry. To view the congressional concern for minority businesses as expressed during the passage of the Public Works Employment Act of 1977 as inapplicable in this case would be unduly myopic. In *Bakke* the classification reservation of medical school admission seats was much more arbitrary than the two and

one-half and one percent goals and the good faith requirement in the instant case.

The instant regulation is a gentle nudge to contractors down the path of hiring minority businesses. Pronouncements of the President, declarations of policy by the Congress, findings of discrimination by the Congress and the President regarding other similar legislation, and the findings of the Secretary of Transportation as a result of the Notice and Comment are sufficient to support the requirement of good faith efforts in the expenditure of federal highway construction funds.

■ Having found that plaintiffs are unlikely to prevail on the merits, the motion for preliminary injunction is denied. Plaintiffs also seek a declaratory judgment. Under 28 U.S.C. § 2201 this Court "may declare the rights and other legal relations of any interested party seeking such declaration." Such a declaration "shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The rights of plaintiffs are not unconstitutionally or otherwise illegally affected by the Department of Transportation's regulations at issue in this case,[15] and a declaratory judgment will issue to that effect.

Since this memorandum resolves all the issues in this case, final judgment is entered from which an appeal may be taken under F.R.A.P. 3, and the case is closed.

---

15. Plaintiffs also challenge the regulations as violative of Tenn.Code Ann. § 54–516. The regulations were promulgated in accord with valid congressional acts and executive orders. Therefore, the supremacy clause, U.S.Const. Art. VI, cl. 2, carries the regulation past any state law challenge.