SOUTH FLORIDA CHAPTER OF the ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., et al., Plaintiffs-Appellees, Cross-Appellants,

v.

METROPOLITAN DADE COUNTY, FLORIDA, et al., Defendants-Appellants, Cross-Appellees.

No. 83–5001.

United States Court of Appeals, Eleventh Circuit.

Jan. 27, 1984.

Rehearing and Rehearing En Banc Denied March 22, 1984.

Robert A. Ginsburg, Dade County Atty., Robert A. Cuevas, Jr., Asst. County Atty., Miami, Fla., for Metropolitan Dade County.

Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Gordon Dean Rogers, David V. Kornreich, Miami, Fla., for South Florida.

John W. Caven, Jr., Jacksonville, Fla., for amicus curiae Northeastern Chapter, Associated General Contractors of America.

G. Stephen Parker, Atlanta, Ga., for ami-Inc., and Justin J. Finger, New York City, for amicus curiae Anti-Defamation League of B'Nai B'Rith.

Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

This case involves the constitutionality of a Metropolitan Dade County ordinance and resolution granting preferential treatment to blacks in its contract bidding process. The ordinance allows the County to·"set aside" contracts for bidding solely among black contractors [1] and contains a "goals"

---

1. The term "black contractor" as used in the challenged ordinance and throughout our opinion denotes a contracting or subcontracting business entity that is at least 51 percentum owned by one or more Blacks, or, in the case of a publicly-owned business, at least 51 percentum of the stock of which is owned by one or more Blacks;

provision by which the county can require that a certain percentage of a contract's value be subcontracted to black contractors. The plaintiffs, non-profit corporations and trade associations, brought suit challenging the ordinance both facially and as applied to the county construction contract for the Earlington Heights Metrorail Station.

The district court held that the set-aside provision violated the Equal Protection Clause of the Fourteenth Amendment and granted a permanent injunction. The court, however, upheld the constitutionality of the goals provision. *South Florida Chapter of the Associated General Contractors of America, Inc. v. Metropolitan Dade County,* 552 F.Supp. 909 (S.D.Fla.1982) [hereinafter cited as *Metro Dade*]. Both sides have appealed from the decision.

### I.

The district court made extensive factual findings of the events leading up to the present controversy.[2] The court found that the May 1980 disturbances in Liberty City had prompted the county to investigate the economic and social opportunities of blacks living in the area. The resulting studies concluded that race relations would continue to deteriorate unless steps were taken to enhance the business opportunities of the black community.

On November 3, 1981, the Dade County Commission in response to these findings adopted Resolution No. R–1672–81.[3] The resolution recognized that past discrimination had "to some degree" impaired the competitive position of black-owned businesses, resulting in a "statistically significant disparity" between the black population, the number of black businesses, and the number of county contracts awarded to black-owned enterprises. The resolution proceeded to announce a "policy of develop-

ing programs and measures to alleviate the problem ..., including specific race conscious measures."

On July 20, 1982, the Dade County Commission adopted Ordinance No. 82–67[4] as a measure designed to implement its policy of fostering black business growth. The Commission premised the ordinance on a finding that:

> Dade County has a compelling interest in stimulating the Black business community, a sector of the County sorely in need of economic stimulus but which, on the basis of past experience, is not expected to benefit significantly in the absence of specific race-conscious measures to increase its participation in County contracts.

The ordinance required that all proposed county contracts be reviewed to determine whether race-conscious measures would foster participation by black contractors and subcontractors. Bid credits, set-asides, minority participation goals and other devices were to be considered. The district court summarized the administrative procedures mandated by the ordinance as follows:

> a. Each department is charged with the responsibility of submitting its recommendations concerning Black set-asides and goals on each construction project under its jurisdiction;
>
> b. A three member contract review committee comprised of county officials is charged with the responsibility of reviewing the Departmental recommendations and submitting a final recommendation on Black set-asides and goals to the county commission for final action;
>
> c. Black subcontractors goals are to be based on "the greatest potential for Black subcontractor participation" and ... "shall relate to the potential availa-

---

and whose management and daily business operations are controlled by one or more such individuals.
Metropolitan Dade County, Fla., Ordinance No. 82–67 (July 20, 1982).

**2.** The district court's findings are binding unless clearly erroneous. F.R.Civ.P. 52(a).

**3.** Resolution No. R–1672–81 is set out in full in the Appendix.

**4.** Ordinance No. 82–67 is set out in full in the Appendix.

bility of Black-owned firms in the required field of expertise";

d. Availability of Black subcontractors should include "all Black-owned firms with places of business within the Dade County geographic area";

e. Black set-asides shall be considered where there exists at least three Black prime contractors with the capabilities consistent with the contract requirements;

f. A Black prime contractor can be under contract for up to three set-asides within any one year period, but no more than one set-aside at a time;

g. Prior to implementation of a Black set-aside, the county commission is to make findings that the Black set-aside is "in the best interest of the County in order to waive formal bid procedures"; and

h. Bid procedures limiting bids to Black prime contractors would be implemented.[5]

*Metro Dade,* 552 F.Supp. at 922.

On July 21, 1982, the day following the passage of Ordinance No. 82–67, the county received and opened bid proposals for the Earlington Heights Station, part of a billion dollar rapid-rail transit system financed with federal, state and local funds. A non-black prime contractor, Peter Kiewit Sons' Company, submitted the lowest bid. The next lowest bid was tendered by Thacker Construction Company, a black prime contractor. These bids were rejected for two reasons: (1) both exceeded the County Engineer's estimate of what the project should cost, and (2) the amounts of the bids had become public, rendering it impossible to conduct competitive bid negotiations under applicable federal regulations. The County Manager then proposed, and the Commission agreed, that the Earlington Heights contract be reviewed under the newly enacted ordinance.

After reviewing departmental recommendations, the Contract Review Committee proposed that the Commission waive the use of formal competitive bids, setting aside the Earlington Heights contract for competitive bidding exclusively among black contractors. In accordance with the administrative procedure provided by the ordinance, the Contract Review Committee found that there were a sufficient number of licensed black contractors in Dade County that possessed the requisite financial and technical capabilities to ensure competition for the contract. Additionally, the Committee suggested the inclusion of a subcontractor goal requiring that fifty percent of the contract's dollar value be awarded to black subcontractors. When combined with the general requirement that the prime contractor personally perform twenty-five percent of the contract, this meant that seventy-five percent of the Earlington Heights contract was being set aside solely for black contractors.

On October 5, 1982, the Dade County Commission passed Resolution No. R–1350–82[6] adopting the Committee's recommendations. The County issued notice that the contract was open for bidding subject to the one hundred percent set-aside and the fifty percent subcontractor goal. The closing date for submission and the opening of bids was set for November 17, 1982.

The plaintiff-appellees filed a complaint in the Southern District of Florida on November 12, 1982, seeking declaratory and injunctive relief. Jurisdiction was premised upon 28 U.S.C. § 1343 as an action seeking relief pursuant to 42 U.S.C. §§ 1981 and 1983 and 28 U.S.C. §§ 2201 and 2202. Two related state-law claims were asserted under the district court's pendent jurisdiction. On November 16, 1982, after both sides presented evidence at a hearing, the district court granted the plaintiffs' motion for a temporary restraining order. On December 16, 1982, the court issued its memorandum opinion, declaring the one hundred percent set-aside unconstitutional, but upholding the use of the fifty percent subcontractor goal.

---

**5.** The regulations are set out in full in the Appendix.

**6.** Resolution No. R–1350–82 is set out in full in the Appendix.

## II.

Because resolution of appellees' pendent claims might render discussion of the federal constitutional claims unnecessary, we address those claims first. *Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The plaintiff-appellees first contend that the County's preferential treatment policy violates the Dade County Home Rule Charter. The district court concluded that the Commission, pursuant to section 4.03(D) of the Charter, may waive competitive bidding when it determines waiver to be in the County's best interests. *Metro Dade,* 552 F.Supp. at 927–28. We agree with this conclusion and discuss the relevant Charter provisions more completely *infra* at 851–852.

Plaintiff-appellees also argue that the challenged policies contravene the Florida Constitution's due process and equal protection guarantees. The Florida courts have held that these provisions confer the same protection as their federal counterparts. *See Florida Canners Association v. Department of Citrus,* 371 So.2d 503, 513 (Fla.2d Dist.Ct.App.1979), *aff'd,* 406 So.2d 1079 (Fla.1981); *Florida Real Estate Commission v. McGregor,* 336 So.2d 1156 (Fla.1976). Determination of this pendent claim, therefore, is necessarily dependent upon the disposition of the federal constitutional issue.

## III.

The United States Supreme Court first directly confronted the constitutionality of affirmative action plans in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Bakke challenged an admissions program instituted by the University of California at Davis Medical School, whereby sixteen of the one hundred available places in the entering class were set aside solely for minority applicants. He contended that the program violated both Title VI of the Civil

Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment.

No clear consensus emerged from the Court's decision. Five justices held that the strict racial quota was invalid, but only Justice Powell, utilizing a strict scrutiny standard of review, reached the decision on constitutional grounds. Justice Stevens, joined by the Chief Justice and Justices Stewart and Rehnquist, concurred in holding the program invalid, but did so on the basis of Title VI, not deciding the constitutional issue. Justices Brennan, White, Marshall and Blackmun, on the other hand, agreed with Justice Powell that Title VI was implicated only if the Equal Protection Clause was also violated, but, relying on an intermediate level of scrutiny, would have upheld the program's validity as substantially related to an important governmental interest.

The Court next addressed the issue in the context of a congressional affirmative action program for federal funding of public works projects. *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The *Fullilove* Court upheld a statute that required local governments receiving funds under a federal public works program to use 10% of the funds for the procurement of services or supplies from statutorily defined minority owned and controlled businesses. Because *Fullilove* addresses the equal protection issue in the context of government construction contracts and funding, it is the most relevant case to our constitutional inquiry. *See Ohio Contractors Ass'n v. Keip,* 713 F.2d 167, 170 (6th Cir.1983).

As in *Bakke,* the Court in *Fullilove* did not produce a majority opinion, with three different views emerging from those Justices voting to uphold the statute. Chief Justice Burger's opinion, in which Justices Powell and White concurred,[7] declined to

---

**7.** The district court referred to the Chief Justice's opinion as the "plurality opinion" in *Fullilove. Metro Dade,* 552 F.Supp. at 931. Two justices also concurred in Justice Marshall's opinion, however, meaning that neither the Chief Justice nor Justice Marshall's opinion

garnered the support of a plurality. Thus, to the extent that the term "plurality opinion" connotes that an opinion commands more support than other opinions in the case, neither Chief Justice Burger nor Justice Marshall's opinion qualifies.

adopt either a strict scrutiny or intermediate scrutiny standard. Instead of articulating a broad rule of law, the Chief Justice's opinion concentrated on "the context presented" in determining whether the statute's objective was within Congress' power and, if so, whether the means used was "narrowly tailored to the achievement of [Congress'] goal." 448 U.S. at 473, 480, 100 S.Ct. at 2772, 2775. The Chief Justice also broadly outlined those aspects that a reviewing court should consider when evaluating such programs:

> For its part, the Congress must proceed only with programs narrowly tailored to achieve its objectives, subject to continuing evaluation and reassessment; administration of the programs must be vigilant and flexible; and, when such a program comes under judicial review, courts must be satisfied that the legislative objectives and projected administration give reasonable assurance that the program will function within constitutional limitations.

448 U.S. at 490, 100 S.Ct. at 2781.

Justice Powell's concurrence reiterated his views in *Bakke* that strict scrutiny was the proper standard of review. The strict scrutiny test would require a finding that the racial classification was "a necessary means of advancing a compelling governmental interest." 448 U.S. at 496, 100 S.Ct. at 2783. This approach requires both specific findings of past discrimination and a choice of remedies "equitable and reasonably necessary to the redress of identified discrimination." *Id.* at 498, 510, 100 S.Ct. at 2785, 2791. Justice Powell also outlined five factors to consider in determining whether the strict scrutiny test is satisfied: (1) the efficacy of alternative remedies; (2) the planned duration of the remedy; (3) the relationship between the number of minority workers to be employed and the percentage of minority group members in the work force; (4) the availability of waiver provisions; and (5) the effect of the remedy on third parties. *Id.* at 510, 514, 100 S.Ct. at 2791, 2793.

Both Chief Justice Burger and Justice Powell's opinions stressed the fact that the statute in *Fullilove* was passed by Congress and should therefore be judged with deference to Congress' broad powers:

> Here we deal ... not with the limited remedial powers of a federal court, for example, but with the broad remedial powers of Congress. It is fundamental that in no organ of government does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees.

*Id.* at 483, 100 S.Ct. at 2777; *see also id.* at 515 n. 14, 100 S.Ct. at 2794 n. 14 (Powell, J., concurring). Their emphasis on the fact that the Court was reviewing a Congressional statute suggests that constitutionally acceptable means of redressing past discrimination vary with the powers of the government body enacting the legislation.

Justice Marshall in his concurrence, joined by Justices Brennan and Blackmun, reaffirmed his view in *Bakke* that an intermediate standard of review was necessary, requiring that the use of benign racial classifications be "substantially related" to "an important and articulated" government purpose. *Id.* Justice Marshall believed that such an approach would guard against possible misuse or stigmatization while still allowing sufficient flexibility to redress past discrimination.

In light of the diversity of views on the Supreme Court, determining what "test" will eventually emerge from the Court is highly speculative. The district court, based upon a review of federal court cases following *Bakke* and *Fullilove,* concluded that strict scrutiny was the proper standard. We rely instead on what we perceive as the common concerns to the various views expressed in *Bakke* and *Fullilove:* (1) that the governmental body have the authority to pass such legislation; (2) that adequate findings have been made to ensure that the governmental body is *remedying* the present effects of past discrimination rather than advancing one racial or

ethnic group's interests over another; and (3) that the use of such classifications extend no further than the established need of remedying the effects of past discrimination. Legislation employing benign racial preferences, therefore, must incorporate sufficient safeguards to allow a reviewing court to conclude that the program will be neither utilized to an extent nor continued in duration beyond the point needed to redress the effects of the past discrimination.

This approach is most closely akin to that set out in Chief Justice Burger's opinion in *Fullilove*. Without adopting a formal "test," it attempts to balance the legitimate objective of redressing past discrimination with the concerns that the chosen means be "narrowly tailored" to the legislative goals so as to not unfairly impinge upon the rights of third parties. Furthermore, the program must be structured in such a way that it is subject to reassessment and will be implemented in a manner that is flexible enough to account for changing needs and circumstances. *See* 448 U.S. at 490, 100 S.Ct. at 2780.

### IV.

#### A.

Pursuant to the above approach, we must first determine whether Metropolitan Dade County was a competent legislative body to adopt remedial measures designed to eliminate past discrimination. In *Fullilove,* both Chief Justice Burger and Justice Powell emphasized the "unique" role accorded Congress in dealing with past discrimination, 448 U.S. at 483, 500, 100 S.Ct. at 2777, 2786. We agree with the Sixth Circuit, however, that the references in *Fullilove* to Congress' power were not intended to imply that governmental bodies other than Congress may not act to remedy past discrimination, but were only emphasizing the "unequaled" power of Congress to act under its specific powers granted by the Fourteenth Amendment. *Ohio Contractors,* 713 F.2d at 172. Thus, although the scope of Congress' power to remedy past discrimination may be greater than that of the states, state legislative bodies are not without authority to

ensure equal protection to persons within their jurisdictions. *Id.*

■ Whether the Metropolitan Dade County Commission as a political subdivision of the State of Florida had the power to enact the ordinance is a question of state law. Dade County operates pursuant to its Home Rule Charter, which specifically grants the county the power to waive competitive bidding when such waiver is in the county's best interests:

> Contracts for public improvements and purchases of supplies, materials, and services other than professional shall be made whenever practical on the basis of specifications and competitive bids. Formal sealed bids shall be secured for all such contracts and purchases when the transaction involves more than the minimum amount established by the Board of County Commissioners by ordinance. The transaction shall be evidenced by written contract submitted and approved by the Board. The Board, upon written recommendation of the Manager, may by resolution adopted by two thirds vote of the members present, waive competitive bidding when it finds this to be in the best interest of the county.

Metropolitan Dade County, Fla., Home Rule Charter § 4.03(D) (as amended through October 5, 1978). When this provision is coupled with the other broad powers granted by the Home Rule Charter, *see Metro Dade,* 552 F.Supp. at 934, we agree with the district court's conclusion that the Commission was competent as a matter of state law to make findings of past discrimination and to enact remedial legislation. *Id.* at 927, 934.

#### B.

■ Having found that the Commission had the authority to enact the ordinance, we must now determine if the Commission made adequate findings to ensure that the county was acting to remedy the effects of past discrimination rather than advancing one group's interests over another based on a perceived need not founded in fact. We agree with the district court that the Com-

mission made sufficient legislative findings to justify race-conscious remedies.

The court found that the Commission's actions were based on "reliable, substantial information compiled by independent investigations." *Metro Dade,* 552 F.Supp. at 917 (Finding # 17). These investigations revealed that past discriminatory practices had impeded the development of black businesses, resulting in an economic disparity between blacks and other groups that had created unrest in the black community. *Id.* at 916 (Finding # 16). Moreover, the court found from the evidence presented that although the present county government had not engaged in discriminatory practices, there had been *"identified discrimination against Dade County black contractors at some point prior to the county's present affirmative action program." Id.* at 925–26 (Finding # 41) (emphasis in original). The Commission in passing both Resolution No. R–1672–81 and Ordinance No. 82–67 relied on the above legislative findings as the premise for their actions, and these findings amply establish a governmental interest justifying the County's measures designed to remedy past discrimination. *See Ohio Contractors,* 713 F.2d at 170–71.

### C.

We must next consider whether the Dade County ordinance facially incorporates sufficient safeguards to ensure that it is narrowly tailored to its legitimate objective of redressing past discrimination. After a careful review of the legislative provisions, we find that adequate safeguards exist to uphold the ordinance's constitutionality.

Before a set-aside or subcontractor goal is approved for a county construction contract, it must pass through three levels of administrative review. First, the county department must suggest through the County Manager which, if any, race-conscious measures are appropriate for the project being reviewed. Reg. 1.02 & 2.03. The suggestions are made on the basis of the availability of black contractors and the goals of the department. Reg. 1.02. Suggested actions may include the use of a set-aside, subcontractor goals, bid credits or no race-conscious measures at all. Reg. 1.04.

Next, the department's suggestions are reviewed by a three member Contract Review Committee. Regs. 2.01 & 2.02. The Committee formulates a recommendation on the advisability of the inclusion of race-conscious measures for the construction contract in question prior to the preparation of contract specifications. Regs. 2.04 & 2.06. This recommendation is then forwarded to the Board of County Commissioners. Reg. 2.06.

Finally, the Board conducts its review of the proposed measures, acting upon the Committee's recommendation and giving advice on how to proceed. Reg. 2.06. In the case of a set-aside, the Board must make findings that the set-aside would be in the best interests of the county before waiving formal bid procedures. Regs. 2.07 & 5.03.

The ordinance and regulations also set out criteria to guide the reviewing bodies as to whether set-asides and goals are appropriate. A set-aside may be used only upon findings that at least three certified black prime contractors are available and that the set-aside would be in the best interests of the County. Ord. 10–38(d)(2); Reg. 5.01. Subcontractor goals must be based upon estimates of the project's subcontracting opportunities and the availability of black subcontractors with the necessary expertise. Ord. 10–38(d)(1); Reg. 4.02.

In addition to the three-tiered review of each construction contract where race-conscious remedies are proposed, the entire program is also subject to periodic review and assessment. The Board must annually reassess the continuing desirability and viability of the program. Ord. § 10–38(e). This reassessment is in part based upon an annual report by the County Manager reporting the percentage of the value of county construction contracts awarded that year to black contractors and subcontractors. Ord. § 10–38(e). The County Manager is also charged with the duty of continually

monitoring the program's use and periodically reporting its findings. Resol. § 3.

We find that these extensive review provisions provide adequate assurances that the County's program will not be used to an extent nor continue in duration beyond the point necessary to redress the effects of past discrimination. Although no definite expiration date is specified, the Board is obligated to review the program annually to assess whether it should be continued or modified, and such a review adequately guarantees that the program will not be continued beyond its demonstrated need. *See Ohio Contractors,* 713 F.2d at 175 (no given expiration date required).[8] Likewise, although no target figure for the program's overall use is specified, adequate review mechanisms exist to ensure that the program will not be misused. Each contract where set-asides or goals are to be used must be approved at three different levels of the county government, and the entire program is subject to periodic monitoring and reassessment by the Board and County Manager.

Our conclusions on the adequacy of the program's safeguards are premised on the understanding that the review process, both for individual contracts and the entire program, will be conducted in a thorough and substantive manner. If the process is carried out in a conclusory fashion or extended beyond its legitimate purpose of redressing the effects of past discrimination, the plaintiffs may of course renew their challenge to the constitutionality of the County's program. We decline to hold the ordinance facially unconstitutional, however, merely on the speculation that the County will not vigorously undertake implementation of the review procedure.

V.

Having found that the ordinance is constitutionally acceptable, we must still determine whether the program was constitutionally applied to the Earlington Heights Station. After reviewing the record, we conclude that the set-aside and subcontractor goal were properly adopted by the county and were appropriate measures for the project.

After the formal bidding on the Earlington Heights contract was rejected,[9] the County Manager recommended that the contract be subjected to the newly enacted procedures of Ordinance No. 82–67. *Metro Dade,* 552 F.Supp. at 923. The Contract Review Committee, in accordance with the requisite administrative procedures, determined that a sufficient number of county black contractors were available with the requisite capability of serving as the prime contractor and recommended that bidding be set aside. *Id.* The Committee also recommended a fifty percent subcontractor goal based on the availability of qualified black subcontractors and the requirements of the project. *Id.*

The Commission adopted the Committee's recommendations, finding:

> as a matter of fact that the use of both a set-aside and a goal on this contract will contribute towards eliminating the marked statistical disparity . . . between the percentage of overall Black business participation in County contracts and the

---

8. A durational limit is one of the five factors that Justice Powell identified for assessing a program's constitutionality. 448 U.S. at 510, 512, 100 S.Ct. at 2791, 2792 (Powell, J. concurring). In *Ohio Contractors,* the Sixth Circuit held that the lack of a durational limit was not "fatal" in light of the Ohio legislature's recognition of the need for future reassessment and reevaluation. 713 F.2d at 175. The dissent argued that the lack of a durational limit combined with what it believed was a lack of sufficient findings of past discrimination led to the statute "present[ing] a real danger of fostering a dependency upon favoritism, which is inimi-

cal . . . to the commands of the Equal Protection Clause." Id. at 176 (Engel, J., dissenting). Here, we have adequate legislative findings, which ensure that Dade County is not merely "fostering a dependency upon favoritism," as well as an annual reassessment by the Board of the continued need for the program.

9. The bids were rejected because they were substantially higher than the County's estimates and because the amount of the bids had become public. *Supra* at 849.

percentage of Dade County's population which is Black.

Resolution No. R–1350–82. In accordance with the ordinance's regulations, the Commission formally found the set-aside to be in the best interests of the county and waived formal bidding. The Commission also incorporated the prior legislative findings of Resolution R–1672–81, which had found both evidence of past discrimination and a need for fostering increased participation by the black business community.

The set-aside and subcontractor goal for the Earlington Heights Station were thus properly adopted by the Commission pursuant to the ordinance and its regulations.[10] The Contract Committee reviewed the availability of qualified black contractors and the demands of the project before making its recommendations, and the Board found the recommendations to be necessary to eliminating the vestiges of past discrimination in the awarding of county construction contracts.

Moreover, we find that the 100% set-aside and 50% subcontractor goal were appropriate, narrowly tailored measures to achieve the legislative objective. In so concluding, we find that the district court erred on several grounds in striking down the set-aside.

First, when discussing the set-aside's relationship to the percentage of black contractors and its impact on third parties,[11] the district court rejected the county's argument that, viewed within the whole context of county procurement, the set-aside constituted only .6% of all county contracts over a ten year period: "It is the propriety of the 100% set-aside of the Earlington Heights Station that is for the determination of the Court. Nothing else." 552 F.Supp. at 937. Yet, when reviewing the 50% subcontractor goal, the court in essence undertook a "totality" review: "The record shows that this contract is but one out of twenty. It is located in the Black community and is a visible symbol of Black participation in the Metrorail system and county construction contracting in general." Id. at 941.

Although we do not agree that a ten year time frame is the proper reference point, a "totality" review is an appropriate means of ascertaining whether a program or its application is narrowly drawn.[12] Here, the estimated cost of approximately $6 million for the Earlington Heights Station, id. at 923, constitutes less than one percent of the County's annual expenditures of $620 million on contracts, id. at 917, and just over one percent of the approximately $581 million spent up to September 30, 1982 on the Dade County Metro rail system itself,[13] id. Considering that blacks constitute over seventeen percent of Dade County's population, yet less than one percent of Dade County contractors are black, id. at 926, the effect of the set-aside and the subcontractor goal is not disproportionate to either the number of blacks and black contractors residing in the County or to the

---

10. The measures, of course, were not proposed prior to the completion of contract specifications (Reg. 1.02), as the contract had already been bid upon. We do not find, however, that in the context of the proceedings concerning the Earlington Heights Station that this omission in any way affected the validity of the set-aside or goal.

11. We rely on Justice Powell's indicia for this part of our discussion not because we are adopting the "strict scrutiny" test, but because the district court relied upon them in its opinion. Moreover, these factors serve as a helpful guide in determining whether a statute satisfies the Equal Protection Clause, regardless of which standard of review is used.

12. All three opinions in Fullilove voting to uphold the statute compared the 10% figure in the statute to the total expenditures by the United States government on construction contracts. 448 U.S. at 484 n. 72, 100 S.Ct. 2778 n. 72 (Burger, C.J.); id. at 514–15, 100 S.Ct. 2793 (Powell, J., concurring); id. at 521, 100 S.Ct. 2796 (Marshall, J., concurring). See also Ohio Contractors, 713 F.2d at 173. The Court's reliance on all funds expended on construction work in the United States as its reference point is an even broader one than we rely upon here.

13. The total cost of the Metrorail system is estimated at approximately one billion dollars, 552 F.Supp. at 917 (Finding # 20), of which the Earlington Heights Station costs would constitute only .6%.

goal of increasing black business participation in order to redress past discrimination.[14] Likewise, considering the small percentage of overall construction contracts affected, we do not find that the set-aside impacts unfairly on third parties.[15] *Cf. Fullilove*, 448 U.S. 484 n. 72, 100 S.Ct. at 2778 n. 72; 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell, J., concurring).

Second, the district court used an abuse of discretion standard to determine whether the 50% figure was reasonable, but not for the 100% set-aside. 542 F.Supp. at 936, 939. We find this inconsistent, as the effect of the 50% figure, although designated a "goals" provision, is to *set aside* 50% of the contract's value for black contractors. We also question the use of an abuse of discretion standard in judging whether a percentage goal or set-aside is reasonable. Although Justice Powell did speak in his *Fullilove* concurrence of the set-aside percentage being within Congress' "discretion," he also noted that a higher level of scrutiny may be necessary for legislation passed by governmental bodies other than Congress. 448 U.S. at 515 n. 14, 100 S.Ct. at 2794 n. 14. We rely on the higher review standard of whether the percentages chosen, either as a set-aside or goal, are narrowly tailored to the legislative objective; we find that they are narrowly tailored here.

Finally, we cannot agree with the district court that the set-aside was impermissible in light of alternative remedies or because it lacked an adequate waiver provision. The County was not required to choose the least restrictive remedy available, *see Fullilove*, 448 U.S. at 508, 100 S.Ct. at 2790 (Powell, J., concurring), and, as discussed above, the set-aside was chosen only after careful consideration of alternative methods and a formal finding by the Board that the set-aside was necessary in this case to redress the effects of past discrimination. Similarly, although the ordinance lacks a formal waiver provision, the set-aside was not approved until after the County had determined both that it would be in its best interests and that enough black contractors were available. These determinations adequately provided the same safeguard as a formal waiver provision, which would protect against the potentially unfair effect "if [the set-aside] were applied rigidly in areas where minority group members constitute a small percentage of the population." *Fullilove*, 448 U.S. at 514, 100 S.Ct. at 2793 (Powell, J., concurring).

## VI.

This case has raised one of the most troublesome questions in the law: how to balance the legitimate goal of redressing past discrimination with concerns that remedial legislation will unfairly infringe on the rights of innocent third parties. Here, we find that Metropolitan Dade County has kept within the restrictions of the Equal Protection Clause in enacting the challenged ordinance, and thus uphold its constitutionality both facially and as applied to the Earlington Heights Station.

The district court's judgment is REVERSED IN PART and AFFIRMED IN PART.

## APPENDIX

Resolution No. R–1672–81

WHEREAS, it has consistently been the policy of this Board to foster economic growth and business opportunities for its population and to promote the development of local businesses; and

WHEREAS, this Board believes that the favorable economic status and future growth prospects of Dade County are integrally linked to the economic and social conditions of the County's Black communities, residents and businesses; and

---

14. As of August 31, 1982, only 7% of the Metrorail construction was being performed by black contractors and subcontractors. 552 F.Supp. at 927 (Finding # 21).

15. We also note, as did the Sixth Circuit, that non-minority contractors may participate by owning up to 49% of a minority establishment. See, *supra* note 1; *Ohio Contractors*, 713 F.2d at 174.

WHEREAS, this Board established the Black Business Participation Task Force and charged that Task Force with, among other things, investigating and assessing the present extent of Black business activity within the County generally and specifically in relation to doing business with the County; and

WHEREAS, this Board hereby adopts the findings and conclusions of the Task Force; and

WHEREAS, that Task Force found a statistically significant disparity between the County's Black population and both the number of Black businesses within the County and those receiving County contracts; and

WHEREAS, this finding of the Task Force that Blacks have not proportionately shared in Dade County's economic development is in accordance with the findings and conclusions set forth in Black Owned Businesses in Metropolitan Miami, a Statistical Analysis of U.S. Census Data, prepared by Tony E. Crapp, Sr., Director, Business Development Division, Department of Trade and Commerce Development, City of Miami (December, 1980); An Economic Adjustment Plan for the Civil Disturbance Areas of the City of Miami and Dade County, prepared by Janus Associates (May, 1981); and the Report of the Governor's Dade County Citizens Committee (October 30, 1980); copies of which reports are appended hereto, and the findings and conclusions of which are hereby adopted by this Board; and

WHEREAS, these reports have found that the gross economic disparity between the Black community and the other communities in Dade County has greatly exacerbated the frustrations of the Black community, which frustrations resulted in the May, 1980 riots and loom as sources of continuing racial and ethnic tensions; and

WHEREAS, this Board recognizes the reality that past discriminatory practices have, to some degree, adversely affected our present economic system and have impaired the competitive position of businesses owned and controlled by Blacks so as to result in this disproportionately small amount of Black businesses, and

WHEREAS, the causes of this disparity are perceived by this Board as involving the long standing existence and maintenance of barriers impairing access by Black enterprises to contracting opportunities and not as relating to the lack of capable and qualified Black enterprises ready and willing to work; and

WHEREAS, Dade County greatly impacts the local economy and business development through its spending of revenue for various County projects and other needs; and

WHEREAS, Dade County has a compelling interest in stimulating the Black business community, a sector of the community sorely in need of economic stimulus but which, on the basis of past experience, is not expected to benefit significantly in the absence of specific measures to increase its participation in County business; and

WHEREAS, this County has a compelling interest in promoting a sense of economic equality for all residents of the County; and

WHEREAS, this Board believes that in order to effectively combat the unemployment and lack of economic participation of the Black community, the Black population must be provided with the opportunity of owning and developing their own businesses,

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

*Section 1.* This Board hereby adopts the policy of developing programs and measures to alleviate the problem of lack of participation of Blacks in the County's economic life and to stimulate the local Black economy, including specific race conscious measures.

*Section 2.* Any program or procedure established pursuant to Section 1 above, shall continue until its objectives are met and must maintain sufficient flexibility to

be able to achieve its purpose while still remaining viable in terms of the needs of the County to transact its business.

*Section 3.* The County Manager shall monitor such programs and present periodic reports to the Board as to their efficacy and viability.

ORDINANCE NO. 82–67:

WHEREAS, this Board has previously made the legislative finding in Resolution No. R–1672–81, adopted November 3, 1981, that Blacks have not proportionately shared in Dade County's economic development and has initiated a policy to promote increased participation of Black-owned businesses in County contracts; and

WHEREAS, such findings and the bases therefor as contained in said Resolution No. R–1672–81, a copy of which is attached hereto, are hereby adopted as the legislative findings on which this Ordinance is based; and

WHEREAS, the above findings are in accordance with the findings and conclusions of the June 1982 report of the United States Commission on Civil Rights entitled, "Confronting Racial Isolation in Miami", a copy of which is appended hereto; and

WHEREAS, the government of Metropolitan Dade County greatly impacts the local economy and business development through its spending of revenue for various County projects and other needs; and

WHEREAS, Dade County has a compelling interest in stimulating the Black business community, a sector of the County sorely in need of economic stimulus but which, on the basis of past experience, is not expected to benefit significantly in the absence of specific race-conscious measures to increase its participation in County contracts,

NOW, THEREFORE, BE IT OBTAINED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

*Section 1.* Article II of Chapter 10 of the Code of Metropolitan Dade County, Florida, is amended by adding the following new section thereto:

Sec. 10–38. *Procedure to increase participation of Black contractors and subcontractors in county contracts.*

(a) The foregoing recitations are hereby incorporated and adopted herein and made a part of this Ordinance.

(b) Except where federal or state law or regulations mandate to the contrary, the provisions of this Section shall be applicable to all construction contracts funded in whole or in part by county funds.

(c)(1) "Black contractor and subcontractor" means a contracting or subcontracting business entity which is owned and controlled by one or more Blacks and has established a place of business in Dade County.

(2) "Owned and controlled" means a business which is at least 51 percentum owned by one or more Blacks, or, in the case of a publicly-owned business, at least 51 percentum of the stock of which is owned by one or more Blacks; and whose management and daily business operations are controlled by one or more such individuals.

(3) "Black" means a person who is a citizen or lawful permanent resident of the United States and who has origins in any of the Black racial groups of Africa.

(d) The County Manager shall establish an administrative procedure for the review of each proposed County construction contract to determine whether the inclusion of race-conscious measures in the bid specifications will foster participation of qualified Black contractors and subcontractors in the contract work. Such race-conscious measures may include goals for Black contractor and subcontractor participation and set-asides.

(1) *Goals.* When utilized, goals shall be based on estimates made prior to bid advertisement of the quantity and type of subcontracting opportunities provided by the project to be constructed and on the availability and capability of Black contractors and subcontractors to do such work. When goals are utilized, the invitation for bid and bid documents shall

require the apparent lower and qualified bidder prior to bid award to meet the goal or demonstrate that he made every reasonable effort to meet the goal and notwithstanding such effort were unable to do so. In the alternative, the bid documents may require such demonstration regarding the goal or efforts to meet it to be included by all bidders as part of their bid submission. The steps required to demonstrate every reasonable effort shall be specified in the invitation for bid and the bid documents.

(2) *Set-asides.* A set-aside is the designation of a given contract for competition solely among Black contractors. Set-asides may only be utilized where prior to invitation for bid, it is determined that there are sufficient licensed Black contractors to afford effective competition for the contract. In each contract where set-asides are recommended, staff shall submit its recommendation and the basis therefor to the Board for its initial review and determination whether waiver of competitive bidding for such contract is in the best interest of the County."

(e) The County Manager shall annually report to the Board on the total dollar amount of County construction contracts awarded that year and the percentage thereof to be performed by Black contractors and subcontractors. At such time, the Board shall determine whether to continue in effect the administrative procedure for utilization of race-conscious measures authorized by this Ordinance.

*Section 2.* Section 10–34 of the Code of Metropolitan Dade County, Florida, is hereby amended as follows:

Sec. 10–34. Listing of subcontractors not required; exceptions.

Except for contracts for procurement or construction of all or any part of stage 1 of the rapid transit system, *construction contracts where race-conscious measures have been included in the bid specifications to foster participation of Black contractors or subcontractors,* or where federal or state law or regulations mandate to the contrary, no prime contractor sub-

mitting a bid for a project for which bids have been solicited by the legal entities to which this article applies shall be required to list thereon the names of any subcontractors it desires to be employed in connection with the subject project.

*Section 3.* Section 25A–4 of the Code of Metropolitan Dade County, Florida is hereby amended by adding the following paragraph at the end of subparagraph (b) of said section:

For all construction contracts, the trust shall comply with the provisions of Section 10–38 of the County Code and the administrative procedures adopted pursuant to said section.

*Section 4.* Section 32A–1 of the Code of Metropolitan Dade County, Florida, is hereby amended by adding the following after the last sentence of said action:

For all construction contracts, the authority shall comply with the provisions of Section 10–38 of the County Code and the administrative procedures adopted pursuant to said section.

*Section 5.* If any section, subsection, sentence, clause or provision of this ordinance is held invalid, the remainder of this ordinance shall not be affected by such invalidity.

*Section 6.* It is the intention of the Board of County Commissioners, and it is hereby ordained that the provisions of this ordinance shall become and be made a part of the Code of Metropolitan Dade County, Florida. The sections of this ordinance may be renumbered or relettered to accomplish such intention, and the word "ordinance" may be changed to "section", "article", or other appropriate word.

*Section 7.* This ordinance shall become effective ten (10) days after the date of its enactment.

REGULATIONS GOVERNING BID PROCEDURES UNDER ORDINANCE NO. 82–67:

1. DEPARTMENT RESPONSIBILITIES

1.01 All departments (including the Public Health Trust and the Miami-Dade Water and Sewer Authority) with funds budgeted

for capital improvement projects are to develop a record keeping system which will include the dollar value of all construction contracts anticipated, a goal for Black participation for the fiscal year, and the dollar value of contracts awarded by minority classification.

1.02 Prior to the completion of contract specifications for each capital project, each department, in conjunction with the consultant project manager, if engaged, will analyze the trades certifications required for each project. After considering the number and types of Black-owned firms likely to be available to participate in the contract, the goals of the department, and a suggestion as to the type of race-conscious measures which could be provided within the contract work are to be developed.

1.03 Suggested actions shall be for (a) establishment of subcontractor goals, (b) set-asides for contractors, (c) bid credit, and (d) no race-conscious requirements.

1.04 Each project is to be submitted to a Contract Review Committee for action and recommendation to the Board of County Commissioners.

## 2. CONTRACT REVIEW COMMITTEE

2.01 A three (3) member Contract Review Committee comprised of an Assistant County Manager, the Capital Improvements Coordinator and the Affirmative Action Coordinator is created. Staff to the Committee will be provided by a Compliance Office included within the Affirmative Action Division.

2.02 The Committee is to meet monthly or sooner, as necessary, for the purpose of reviewing suggestions for the inclusion of race-conscious measures within contract specifications of each construction project.

2.03 Suggested race-conscious actions are to originate by the County project manager for the construction project and the consultant project manager, if commissioner.

2.04 Projects are to be submitted to the Contract Review Committee prior to preparation of the contract specifications.

2.05 The Contract Review Committee, after considering the number of anticipated subcontractors likely to be employed on the job, will recommend at what point the subcontractors will be listed.

2.06 Following review by the Contract Review Committee, a recommendation is to be submitted to the Board of County Commissioners for action, together with the request for advisement.

2.07 Recommendations for set-aside projects require a waiver of formal competitive bids by the Board of County Commissioners.

## 3. CERTIFICATION

3.01 All firms participating in the Black Contractors and Subcontractors Program will be certified as Black firms.

3.02 Certification records will be maintained by the Contract Compliance Office within the Dade County Affirmative Action Division.

3.03 Assistance in the certification process will be provided by authorized community-based organizations under contract with Dade County.

3.04 Applications for certification will be on standard forms and will include, but will not be limited to, primary business location, evidence of ownership, operation, experience, and the adequacy of the firms.

3.05 Appeals of denials of certification can be made to the Contract Review Committee.

3.06 Certification of all firms will be updated annually.

3.07 Certification of each firm shall be completed prior to the award of any contract under the Black Contractors Program.

3.08 A concentrated, public advertising campaign by trade certification area will be undertaken to encourage certification.

## 4. SUBCONTRACTOR GOALS

4.01 Percentage goals for the dollar value of subcontractor work are to be considered when the review of the proposed contract indicates the greatest potential for Black subcontractor participation.

4.02 Goals shall relate to the potential availability of Black-owned firms in the required field of expertise.

4.03 Availability should include all Black-owned firms with places of business [that] are within the Dade County geographic area.

4.04 When goals are included with the contract of the prime contractor, bidders shall use good faith efforts to meet the goals.

4.05 Lack of good faith efforts will make the prime contractor's bid ineligible for award and not responsive.

4.06 A prime contractor may include the subpart of the volume of value of a joint venture of a certified subcontractor towards the contract goal.

## 5. SET–ASIDES

5.01 Contracts for set-asides shall be considered in those contracts when at least three (3) certified prime contractors with the capabilities consistent with the contract requirements exist.

5.02 A prime contractor can be under contract for only one (1) set-aside contract at a time, and no more than three (3) within any one (1) year period.

5.03 Prior to the advertising for set-aside contracts, the Board of County Commissioners is to make findings as to the proposed set-aside contract in the best interest of the County and waiving formal bid procedures.

5.04 Bid procedures limiting competitive bids to Black certified firms will be implemented.

## 6. BID CREDIT

6.01 Implementation of bid credit will not be done at this time.

### RESOLUTION NO. R–1350–82:

WHEREAS, this Board on November 3, 1981, adopted Resolution No. R–1672–81, finding that Blacks have not proportionately shared in Dade County's economic development and setting forth a policy to promote increased Black business participation in County business; and

WHEREAS, this Board on July 20, 1982, enacted Ordinance No. 82–67 which requires review of proposed county construction contracts to determine whether the addition to bid specifications of race conscious measures will foster participation of Black contractors and subcontractors in the contract work; and

WHEREAS, pursuant thereto the County Manager has created a contract review committee to review each construction contract prior to advertisement and to make recommendations thereon to this Board; and

WHEREAS, the committee has reviewed the Metrorail Earlington Heights Station contract together with the data and suggestions submitted by the Dade County Transportation Administration; and

WHEREAS, the committee has determined that there are sufficient licensed Black general contractors to afford effective competition for the station contract were the contract set aside for competition solely among Black contractors, and based thereon has recommended use of a set-aside on this contract; and

WHEREAS, in addition thereto, the committee has estimated the quantity and type of subcontracting opportunities provided by the contract and the availability and capability of Black contractors and subcontractors to do such work and based thereon has recommended a goal of fifty percent (50%) of the dollar value of the contract to be subcontracted to Black contractors; and

WHEREAS, Earlington Heights is the last of the 20 Metrorail stations to be bid and is located within the Black community of Dade County; and

WHEREAS, increased participation of Black contractors and subcontractors on this contract will have a substantial impact in the community to be served by this station both in terms of the credibility of the County's efforts to involve Black-owned businesses in the economic growth of this County and in terms of greater employment opportunities for members of such community; and

WHEREAS, this Board specifically finds and determines as a matter of fact that the use of both a set aside and a goal on this contract will contribute towards eliminating the marked statistical disparity, noted in this Board's prior legislation, between the percentage of overall Black business participation in County contracts and the percentage of Dade County's population which is Black; and

WHEREAS, this Board further finds that the use of both a set aside and a goal will help to alleviate unemployment and stimulate the Black business community, a sector of Dade County's economy which is sorely in need of economic stimulus, but which on the basis of past experience cannot be expected to receive any significant amount of the public funds to be expended on this contract in the absence of such race conscious measures,

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA, that:

1. Resolution No. 4–1672–81 [sic] and Ordinance No. 82–67, together with the findings contained therein, and the documents and reports attached thereto, and the foregoing recitations are hereby incorporated and adopted as the legislative findings of this Board and are made a part of this resolution.

2. The recommendations of the contract review committee are accepted by this Board.

3. This Board finds that it is in the best interests of Dade County to waive formal competitive bidding procedures for the Earlington Heights Metrorail Station contract, and authorizes the set aside of such contract for competition solely among Black contractors, formal bidding being waived in this instance pursuant to Section 4.03(D) of the Home Rule Charter by two-thirds (⅔) vote of the Board members present.

4. In addition to the set aside, a goal of 50% of the dollar value of the contract work for Black subcontractors is adopted on this project.