**S.J. GROVES & SONS COMPANY and
Jasper Construction Co., Plaintiffs,**

v.

**FULTON COUNTY, et al., Defendants.**

Civ. A. No. C82–1895A.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 30, 1987.

Geoffrey Stephen Parker, Southeastern Legal Foundation, Inc., Atlanta, Ga., amicus.

Peter A. Wade, Griffin, Cochrane, Marshall & Elger, Atlanta, Ga., for plaintiffs.

Paul Webb, Jr., Keith Mark Wiener, Webb & Daniel, Atlanta, Ga., for defendants.

Nina Loree Hunt, Office of U.S. Atty., Atlanta, Ga., for cross-defendant.

## ORDER

FORRESTER, District Judge.

I. INTRODUCTION.

A. *Background.*

This action challenging the constitutionality of the Federal Department of Trans-

portation's Minority Business Enterprise (MBE) rule is before the court on cross motions by the plaintiffs and the federal defendants for summary judgment on counts IX and X of the plaintiffs' fifth amended complaint. The federal defendants are the United States Department of Transportation and Elizabeth H. Dole, the Secretary of the United States Department of Transportation (hereinafter referred to jointly as "DOT"). The plaintiffs are S.J. Groves & Sons Company and Jasper Construction company, Minnesota corporations with their principal place of business in Minneapolis, Minnesota. Jasper Construction Company is a wholly owned subsidiary of S.J. Groves & Sons Company.

According to the plaintiffs' complaint, defendant Fulton County issued an invitation to bid for the construction of base, pavement, and related work at Fulton County Airport–Brown Field in Atlanta. The invitation advised bidders of Fulton County's goals for MBE participation and promised the contract to the lowest responsible bidder who met the MBE goals or made good faith efforts to do so. The plaintiffs' timely bid, submitted in May of 1982, was the lowest bid received. The plaintiffs contend that they made a good faith effort to meet the MBE goals but failed. Fulton County awarded the contract to another bidder whose assurance of MBE participation percentage was greater than the plaintiffs'.

The plaintiffs sued Fulton County for breach of contract, arguing in Counts I through V that the county's rejection of the plaintiffs' bid violated Georgia's low-bid statute, O.C.G.A. § 36–10–2, and that the MBE program violated the Georgia Constitution (Art. I, Sec. 1, Par. 2), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and the equal protection clause of the fourteenth amendment. Counts VI through VIII of the complaint challenge a June 6, 1984 resolution of the Fulton County Board of Commissioners that reenacted an MBE affirmative action program. The resolution was challenged under the state low-bid statute, the equal protection clause

of the fourteenth amendment, and Title VI.[1]

In an order filed September 30, 1985 this court granted summary judgment to the plaintiffs on counts VI through VIII concerning the 1984 resolution. The court denied the plaintiffs' motion for summary judgment on count I because the plaintiffs' good faith effort to meet the MBE goals was disputed. In addition, the defendant Fulton County claimed federal preemption of Georgia's low bid statute, O.C.G.A. § 36–10–2, by the United States Department of Transportation regulation, if valid. The court agreed with Fulton County that the state statute would be preempted if the regulation were valid and deferred the motions as to counts II through V pending joinder of the federal defendants and resolution of the regulation's validity. The plaintiffs' Fifth Amended Complaint added counts IX and X, alleging that the federal defendants' promulgation of the MBE regulation violated, *inter alia*, the equal protection component of the fifth amendment.

### B. *Framework for Analysis.*

■ As the court noted in its September 30, 1985 order, "the validity under federal law of a voluntarily-enacted affirmative action plan which permits race-conscious relief turns on application of the standards set out in *South Florida Chapter of the Associated General Contractors of America v. Metropolitan Dade County, Florida,* 723 F.2d 846, 851 (11th Cir.1984) [*reh'g denied,* 729 F.2d 1468, *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984)]." Order, at 31. In *South Florida Chapter,* the Eleventh Circuit set out a three-step analysis for affirmative action plans enacted by governmental bodies. Under that analysis, the court must ensure:

(1) that the governmental body have the authority to pass such legislation; (2) that adequate findings have been made to ensure that the governmental body is *remedying* the present effects of past

---

1. Jasper Construction Company is a plaintiff in counts six through eight because of its present involvement in construction work in Atlanta and the alleged detriment caused to it by the county's MBE resolution.

discrimination rather than advancing one racial or ethnic group's interests over another; and (3) that the use of such classifications extend no further than the established need of remedying the effects of past discrimination.

*723 F.2d at 851–52* (original emphasis). The last two steps parallel the two-pronged examination utilized by a plurality of the Supreme Court in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986):

First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal."

Accordingly, the court will outline the regulation at issue here and will then proceed to analyze its validity according to the *South Florida Chapter* framework.

### C. *DOT's MBE Regulation.*

DOT's regulation entitled "Participation by Minority Business Enterprise in Department of Transportation Programs" is found at 49 C.F.R. § 23.01 *et seq.*[2] The regulation defines minority as follows:

"Minority" means a person who is a citizen or lawful permanent resident of the United States and who is:

(a) Black (a person having origins in any of the black racial groups of Africa);

(b) Hispanic (a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race);

(c) Portuguese (a person of Portuguese, Brazilian, or other Portuguese culture or origin, regardless of race);

(d) Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands); or

(e) American Indian and Alaskan Native (a person having origins in any of the original peoples of North America.)

(f) Members of other groups, or other individuals, found to be economically and socially disadvantaged by the Small Business Administration under section 8(a) of the Small Business Act, as amended (15 U.S.C. § 637(a)).

49 C.F.R. § 23.5. "Minority business enterprise" or "MBE" is defined as "a small business concern ... which is owned and controlled by one or more minorities or women." *Id.*

The MBE regulation requires recipients of DOT funds (state and local governments) to implement an MBE program incorporating certain specific features. The regulation does not set a uniform percentage goal but leaves it to the recipients to do so. Among the required components of MBE programs are the following:

(a) A policy statement expressing a commitment to use MBEs in all aspects of contracting to the maximum extent feasible;

(b) The designation of an MBE liaison officer;

(c) Affirmative action techniques to facilitate MBE participation in contracting, including the following:

(1) arranging solicitations, time for the presentation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of MBEs;

(2) providing assistance to MBEs in overcoming barriers such as the inability to obtain bonding, financing, or technical assistance; and

(3) carrying out information and communications programs on contracting procedures and specific contracting opportunities in a timely manner, with such programs being bilingual where appropriate.

(d) Encouraging the use of banks owned or controlled by minorities or women;

---

2. On May 17, 1979 DOT issued a Notice of Proposed Rule Making (NPRM) for the MBE regulation. 44 Fed.Reg. 28928. A final rule was issued March 31, 1980. 45 Fed.Reg. 21172. On March 3, 1981 DOT issued an NPRM to amend one provision of the MBE regulation. 46 Fed.Reg. 16282. The regulation was promulgated in its present form as a final rule on April 27, 1981. 46 Fed.Reg. 23457.

(e) Making an MBE directory available to bidders;

(f) Certification of the eligibility of MBEs by the recipient, to ensure that the MBE program benefits only firms owned and controlled by minorities;

(g) Establishing percentage goals for the dollar value of work to be awarded to MBEs, including overall goals and goals on each specific prime contract with subcontracting possibilities; overall goals are to be based on a projection of the number and types of MBEs likely to be available to compete for contracts; goals for specific contracts are to be based on the known availability of qualified MBEs; and

(h) A requirement that bidders who do not meet the MBE contract goals satisfy the recipient that the bidder has made "good faith efforts" to meet the goals.[3]

*See* 49 C.F.R. § 23.45.

Finally, the regulation includes a provision allowing exemptions from the above-listed requirements if "the particular situation is exceptional" and if "the modified program complies substantially" with the regulations. *Id.* § 23.41(f).

## II. WHETHER THE REGULATION WAS AN EXERCISE OF VALIDLY DELEGATED AUTHORITY.

█ Substantive agency regulations have the "force and effect of law," and therefore preempt state statutes, only when they are "rooted in a grant of [legislative] power by the Congress and subject to limitations which that body imposes."

*Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979). "[I]t is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Id.* at 304, 99 S.Ct. at 1719. "What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308, 99 S.Ct. at 1721.[4]

In the preface to the regulation, 49 C.F.R. part 23, the Secretary of Transportation identifies eight sources of authority for the regulation:

Sec. 905 of the Railroad Revitalization and Regulatory Reform Act of 1978 (45 U.S.C. 803); Sec. 30 of the Airport and Airway Development Act of 1970, as amended (49 U.S.C. 1730); Sec. 19 of the Urban Mass Transportation Act 1964, as amended (Pub.L. 95–599); Title 23 of the U.S.Code (relating to highways and highway safety); Title 6 of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*); the Federal Property and Administrative Services Act of 1949 (49 U.S.C. 471 *et seq.*); Executive Order 11625; Executive Order 12138, unless otherwise noted.

One district court has held that none of the eight statutes or Executive Orders cited constitutes a delegation of congressional authority to DOT. *Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629 (M.D. Ala.1980). Another district court rejected all but the Executive Order as the source of the agency's authority. *M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D.Tenn.1981).[5]

---

3. The regulation does not define what constitutes "good faith efforts," but instead leaves the determination to the recipient. In Appendix A to subpart C of the regulation DOT provides a list meant to suggest the kinds of efforts recipients might consider. A determination of whether the instant plaintiffs' actions constituted good faith efforts is not necessary to the resolution of the present motions, since the complaint presents a facial challenge to the regulation.

4. The Court concluded in *Chrysler Corp.* that the statutes relied on by the Secretary of Defense did not authorize the regulations at issue there. 441 U.S. at 303–12, 99 S.Ct. at 1718–23.

5. Though this court's resolution of the source of authority issue, *infra,* makes extended discus-

sion of Executive Order 11625 unnecessary, the court notes that there are serious problems with relying on the Executive Order as the requisite source of authority. First, the Executive Order does not authorize any efforts not then in effect. The Executive Order, which is directed primarily to the Secretary of Commerce, merely directs that "[e]ach Federal department or agency shall, within constraints of law ..., continue all *current* efforts to foster and promote minority business enterprises." Section 3(e) (emphasis supplied). It is undisputed that DOT had no race-conscious MBE programs in effect at the time the Executive Order was issued. Second, the Executive Order could not authorize any efforts, even if then in effect, that were without congressional authorization. The Executive Order must

The present case is unlike *Central Alabama Paving* and *M.C. West*, however, in that the construction project being funded by DOT is an airport rather than a highway. The most obvious possible source of authority for the MBE regulation, at least as applied to airport programs, is the Airport and Airway Improvement Act of 1982, 49 U.S.C.App. §§ 2201 *et seq.*, originally known as the Airport and Airway Development Act (AADA) of 1970. Section 30 of the AADA, now 49 U.S.C.App. § 2219, provides:

> The Secretary shall take affirmative action to assure that no person shall, on the grounds of race, creed, color, national origin, or sex, be excluded from participating in any activity conducted with funds received from any grant made under this chapter. The Secretary shall promulgate such rules *as the Secretary deems necessary to carry out the purposes of this section* and may enforce this section, and any rules promulgated under this section, through agency and department provisions and rules which shall be similar to those established and in effect under title VI of the Civil Rights Act of 1964.

(Emphasis supplied).

■ The language emphasized above is much broader than the statutory language found wanting in *Central Alabama Paving* and *M.C. West*. For example, the court in *Central Alabama Paving* analyzed the language of section 905 of the Railroad Revitalization and Regulatory Reform Act (RRA) of 1976, 45 U.S.C. § 803. The court concluded that the RRA was not a "conscious conferral of authority" by Congress because "nothing in the Railroad Revitalization Act confers on DOT the authority to further the statute's general anti-discrimination provisions by whatever means it deems efficacious." 499 F.Supp. at 638. Here, the AADA does grant such broad authority to effectuate the Act's purposes, and those purposes explicitly include preventing race discrimination. The language of the AADA is also quite different from

itself be congressionally authorized. *See Chrysler Corp.*, 441 U.S. at 304, 99 S.Ct. at 1718.

the "thou-shalt-not discriminate laws" discussed, and rejected as statutory bases for DOT's MBE regulation, in *M.C. West*, 522 F.Supp. at 345.

There is a further difference between the AADA and statutes that fail to provide a nexus between the MBE regulation and a delegation of congressional authority. The AADA authorizes "rules which shall be similar to those established and in effect under title VI of the Civil Rights Act of 1964." 49 U.S.C. § 2219. The Title VI regulations, which were in force in their present form at the time § 30 of the AADA was adopted in 1976 and are now found at 49 C.F.R. § 21.1 *et seq.*, explicitly condone race conscious remedies:

> This part does not prohibit the *consideration of race*, color, or national origin if the purpose and effect are *to remove* or overcome *the consequences of practices or impediments which have restricted* the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. *Where prior discriminatory practice* or usage tends, on the grounds of race, color, or national origin, *to exclude individuals from participation in*, to deny them the benefits of, or to subject them to discrimination under any program or activity to which this part applies, *the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage.*

49 C.F.R. § 21.5(b)(7) (emphasis added).

Given the broad language of the civil rights section of the AADA, the difference between the language of the AADA and that of other statutes that fail to satisfy the *Chrysler Corp.* standard, and the statute's approval of regulations incorporating race consciousness, the court concludes that DOT's MBE regulation is rooted in a grant of congressional authority and therefore does have "the force and effect" of law [6] to the extent that the regulation is

6. The AADA's grant of authority satisfies the *Chrysler Corp.* standard, i.e., this court reason-

constitutional. A fair reading of this section would indicate congressional delegation of the power to require racial classification, preference or set aside by a recipient of federal funds if found necessary to remove or overcome the effects of past discrimination. The remaining questions include whether the discrimination must have been that of the DOT or of the recipient and whether the "effect" is only difficulty or barriers confronted by extant MBEs or by the small population of MBEs caused by past *societal* discrimination.

## III. WHETHER THE REGULATION IS CONSISTENT WITH THE FIFTH AMENDMENT.

The Supreme Court recently addressed the constitutionality of race conscious remedies in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).[7] The plurality opinion in *Wygant,* written by Justice Powell and joined by three other justices, made it clear that "strict scrutiny" applies to racial classifications that operate against non-minorities. *Id.* at 1846.[8] The plurality opinion also set out the proper framework for analysis of such cases:

"Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." There are two prongs to this examination. First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State to

effectuate its purpose must be "narrowly tailored to the achievement of that goal." *Id.* (citations omitted).

DOT contends that the two-pronged "searching examination" is unnecessary in this case because the MBE regulation is not a preference based on racial or ethnic criteria. According to DOT,

The regulation, as amended, does not mandate prime contractors to award contracts or subcontracts on the basis of race or gender. Rather, it requires that such contractors engage in good faith efforts to recruit and consider for subcontracting possibilities those MBEs who are qualified and available to compete. Its function is to provide assurance that contractors do not discriminate against MBEs, not to require discrimination in their favor.

Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Federal Defendants' Cross Motion for Summary Judgment, at 8 (footnote omitted). It concedes, however, that the regulation requires a recipient to establish an overall goal for the entire MBE program or for a specific grant or for an individual contract if it has subcontracting possibilities. *Id.* at 5.

DOT's argument is equivalent to the "goal" versus "quota" word game engaged in by the parties in *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In his opinion holding unconstitutional the university's special admissions program, Justice Powell rejected the version of DOT's argument presented in that case:

---

ably is able to conclude that the AADA *contemplates* DOT's MBE regulation, but it is still true that the statute does not specifically authorize race-conscious remedies such as MBE goals. DOT's adoption of such a remedy should therefore be more carefully scrutinized for constitutional validity than a regulation pursuant to an express congressional directive to adopt such a remedy. *See* Note, Principles of Competence: The Ability of Public Institutions to Adopt Remedial Affirmative Action Plans, 53 U.Chi.L. Rev. 581, 600 (1986) (hereinafter referred to as "Note").

7. The court held in *Wygant* that a school board's policy of extending preferential protection

against lay-offs to minority employees violated the equal protection clause of the fourteenth amendment.

8. For recognition that a majority of the Supreme Court now seeks to review race-conscious affirmative action plans under a standard of strict scrutiny, *see* Note, 53 U.Chi.L.Rev. at 581 n. 1, 622 Note 174. *See also United States v. Paradise,* 480 U.S. 149, 164–70, 107 S.Ct. 1053, 1063–66, 94 L.Ed.2d 203 (1987), where a different plurality applied strict scrutiny without deciding whether that analysis is always appropriate to affirmative action programs.

This semantic distinction is beside the point: the special admissions program is undeniably a classification based on race and ethnic background. To the extent that there existed a pool of at least minimally qualified minority applicants to fill the 16 special admission seats, white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants. Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status.

*Id.* at 289, 98 S.Ct. at 2747 (footnote omitted).

█] Here, as in *Bakke*, if the program goals are met non-MBEs are effectively prevented from competing for all available subcontracts, although MBEs may. Further, the affirmative steps contemplated for contractors and recipients mean that MBEs compete on a much more favorable basis. *See* 49 C.F.R. Part 23, Subpart C, Appendix A ("Guidance Concerning Good Faith Efforts"). DOT's MBE program "involves a purposeful, acknowledged use of racial criteria," *id.* at 289 n. 27, 98 S.Ct. at 2747 n. 27, and is therefore a "classification based on race." Significantly, DOT's argument that its MBE program does not create a racial preference was flatly rejected in both previous challenges to the program. *See M.C. West*, 522 F.Supp. at 343 ("the setting of goals and standards for compliance, be they compulsory or good faith standards, for the expenditure of federal funds to the benefit of a certain group of individuals is a preference"); *Central Alabama Paving*, 499 F.Supp. at 636 ("[T]hese regulations ... accord a preference to one group of citizens based on race").[9]

### A. Whether the Regulation was Justified by a Compelling Governmental Interest.

A governmental body may have a compelling interest in remedying prior discrimination, and that interest may serve to justify its imposition of race conscious programs, *Wygant*, 106 S.Ct. at 1847 (plurality opinion), but only in certain circumstances. As Justice Powell wrote in *Wygant:*

This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of *prior discrimination by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination.... [T]he relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination.

*Id.* (emphasis supplied). Justice O'Connor, concurring, "agree[d] with the Court that a governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny." *Id.* at 1854.[10]

---

**9.** DOT attempts to distinguish *Central Alabama Paving* as a decision concerned exclusively with the "conclusive presumption" provision of the regulation, which has since been amended and replaced by the "good faith efforts" requirement. But that characterization of *Central Alabama Paving* is simply wrong. The plaintiffs in that case challenged both the conclusive presumption provision *and* the regulation's requirement of an overall fixed percentage goal. 499 F.Supp. at 633. The court concluded that "these regulations," not one or the other provision of the regulations, "accord a preference to one group of citizens based on race." *Id.* at 636.

**10.** Though the parties have not raised this issue, the court notes that some of the plurality's language in *Wygant* seems to describe the "findings" issue as a question of fact rather than of law. *See* 106 S.Ct. at 1848 ("The trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary"); *id.* at 1849 n. 5 ("The very nature of appellate review requires that a factfinder determine whether the [governmental body] was justified in implementing a remedial plan.... [T]he requirement of such a determination by the trial court is not some arbitrary barrier set up by today's opinion. Rather, it is a necessary result of the requirement that race-based state action be remedial"). If the question whether DOT has made adequate findings is a question of fact, it cannot be resolved in the context of the present summary judgment motions because the issue is certainly in dispute. However, the Supreme Court has never before treated the findings issue purely as a question of fact for the trial court. Instead, the court has itself

The "showing of prior discrimination" required by the plurality in *Wygant* need not be the equivalent of a judicial determination that such discrimination existed. Instead,

[the governmental body] must insure that, before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

*Id.* at 1848. *See also id.* at 1855–56 (O'Connor, J., concurring) (requiring the government to "act on the basis of information which gives them a sufficient basis for concluding that remedial action is necessary"); *South Florida Chapter,* 723 F.2d at 852 (requiring "adequate findings to ensure that the county was acting to remedy the effects of past discrimination rather than advancing one group's interest over another based on a perceived need not founded in fact").

The "showing" or "findings" of prior discrimination relied on by DOT in its decision to formulate MBE regulations consist of the following: [11]

(1) Comments received by DOT in response to the May 17, 1979 NPRM for the MBE regulation, the March 31, 1980 final rule, and the March 12, 1981 proposed amendment to section 23.45 of the MBE regulation;

(2) "Appendix II," a narrative description of the evidence supporting the regulation prepared as an appendix to a DOT brief filed in *M.C. West v. Lewis,* 522 F.Supp. 338, and various agency and commission reports referenced in "Appendix II;"

(3) Data referenced in the preambles to the May 17, 1979 NPRM, the March 31, 1980 final rule, and the regulatory evaluations attached thereto.[12]

Very little of the material contained in the three listed sources even remotely resembles "findings" of prior discrimination by DOT or its recipients.[13] First, the comments received by DOT in response to its NPRM, final rule, and proposed amendment cannot serve as findings of prior discrimination. By definition the comments *followed* DOT's drafting and public proposal of the MBE regulation; the comments cannot serve as the basis of a regulation that had already been drafted. Nor were

made the necessary determination. *See Fullilove v. Klutznick,* 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (Opinion of Burger, C.J.); *id.* at 502–06, 100 S.Ct. at 2787–89 (Powell, J., concurring); *University of California Regents v. Bakke,* 438 U.S. 265, 307–10, 98 S.Ct. 2733, 2757–59, 57 L.Ed.2d 750 (1978) (Opinion of Powell, J.). The courts of appeals also treat the findings issue as a question of law that requires an appellate determination independent from the district court's conclusions. *See, e.g., J.A. Croson Company v. City of Richmond,* 779 F.2d 181, 188–90 (4th Cir.1985), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3327, 92 L.Ed.2d 733 (1986). Finally, other district courts have resolved the findings issue, in similar cases, at the summary judgment stage. *See Associated General Contractors v. City and County of San Francisco,* 619 F.Supp. 334, 340 (N.D. Cal.1985); *Michigan Roadbuilders Association, Inc. v. Milliken,* 571 F.Supp. 173, 177–87 (E.D. Mich.1983), *appeal dismissed,* 742 F.2d 1456 (6th Cir.1984). This court will follow the traditional characterization of the findings issue and will treat it as a question of law amenable to resolution at the summary judgment stage.

11. Neither the authorizing statutes nor the regulations contain any findings of prior discrimination, and DOT does not contend otherwise.

12. Most, if not all, of these documents in the three categories are contained in the plaintiffs' Composite Exhibits 29 and 30. The above description of the thousands of pages contained in Exhibits 29 and 30, and DOT's identification of the documents as its "findings," comes from DOT's February 25, 1986 letter to the plaintiffs, attached as Exhibit C to Plaintiffs' Motion for Summary Judgment on Counts IX and X, and from Plaintiffs' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment on Counts IX and X, at ¶ 2.

13. The correct focus is on prior discrimination by DOT or recipients of DOT funds because the AADA's authorization for affirmative action by DOT, if such authorization exists at all, extends only to "activit[ies] conducted with funds received" under the AADA. 49 U.S.C. § 2219. By no stretch of the imagination does the statute authorize DOT to attempt to remedy all discrimination or even all discrimination in the construction industry. *See* Note 53, U.Chi.L.Rev. at 604 note 103 (the distinction between societal discrimination and discrimination by the governmental body is "a consequence of the differences in authority commonly seen among government bodies").

the comments the basis of any changes in the regulation relevant to the present case.[14] The most that could be argued is that the comments might serve to confirm DOT's suspicion that prior discrimination had existed. However, DOT has not made such an argument and has provided the court with no analysis or description of the content of the comments. It is reasonable to assume that a substantial percentage of the comments *opposed* the concept of MBE goals and that another substantial percentage was concerned primarily with details of the regulation, such as definitions and paper work requirements, and not the regulation's underlying justification. Absent any indication from DOT that any of the comments provided evidence of prior discrimination by DOT, this court cannot assume that such evidence is in there somewhere.[15]

Second, though some of the evidence presented in "Appendix II" is more probative than the comments discussed above, the evidence is far too weak to justify race conscious remedial measures.[16] In the nineteen-page document, the court could find only four pieces of information that had any tendency at all to support a conclusion that DOT or its recipients had previously discriminated in letting government contracts. The first is the statistic, attributed to Senator Brooke, 123 Cong.Rec.

7156 (1977), that less than one percent of federal contract dollars goes to MBEs. Appendix II, at 12. Even assuming the statistic is accurate, it is incomplete, overbroad, and outdated. It is incomplete because it does not give the corresponding ratio of MBE contractors to non-MBE contractors competing for federal dollars.[17] It is overbroad because it is not limited to DOT contracts under the AADA or even to DOT contracts generally, but instead includes all federal contract dollars. It is outdated because statistics only two years later show that, for DOT contracts at least, MBEs were receiving 2.7 percent. *See* 45 Fed.Reg. 21172, 21174.

The other arguably probative pieces of evidence in Appendix II are drawn from a report of the U.S. Commission on Civil Rights entitled "Minorities and Women as Government Contractors" (May 1975). The report relates the following: (1) 44.8% of 125 owners (104 minority, 21 women) interviewed by the Commission "felt" that federal contracting officers imposed more stringent criteria on MBEs and WBEs during the bidding and selection process; (2) "several contracting officers" interviewed by the Commission made remarks against MBEs indicating that they may not exercise their discretion in favor of MBEs and "a few contracting officers" expressed the

---

**14.** The one amendment promulgated by DOT substituted the present "good faith efforts" provision for the original "conclusive presumption" provision. The latter required that if any contractor offering a reasonable price met the recipient's MBE goal, the recipient was to presume conclusively that all other bidders were ineligible for failure to exert sufficient efforts to reach the MBE goal. *See Central Alabama Paving,* 499 F.Supp. at 632, citing 45 Fed.Reg. 21188.

**15.** The court in *M.C. West,* 522 F.Supp. at 347-48, reached the opposite conclusion without reciting any reason to believe that the comments received actually supported DOT's conclusion that the regulation was warranted by prior discrimination. Instead, the court justified its acceptance of the "Notice and Comment Adversary-Like Process" as sufficient "findings" primarily because the findings reviewed in *Fullilove,* 448 U.S. 448, 100 S.Ct. 2758, were unspecific. However, as the opinions in *Fullilove* made clear, DOT is required to compile a more specific record than is Congress. *See, e.g.,* 448 U.S. at

478, 100 S.Ct. at 2774 (Opinion of Burger, C.J.) and the discussion *infra* at 1489-90.

**16.** The court assumes, and DOT has not indicated otherwise, that "Appendix II" synthesizes the strongest evidence of prior discrimination from the hundreds of pages of reports it references. Therefore, only the evidence actually discussed in Appendix II will be dealt with here.

**17.** The school board in *Wygant* relied on similarly mis-matched statistics. *See* 106 S.Ct. at 1857 (O'Connor, J., concurring) (disparity between percentage of minorities on teaching staff and percentage of minorities in student body not probative of employment discrimination; relevant statistic is percentage of minorities available in relevant labor pool). *See also J. Edinger & Son, Inc. v. City of Louisville,* 802 F.2d 213 (6th Cir.1986) (city's reliance on general population statistics not sufficient to support preference to minority-owned businesses on city contracts). *Compare United States v. Paradise,* 480 U.S. 149, 179, 107 S.Ct. 1053, 1071, 94 L.Ed. 2d 203 (1987).

belief that MBEs are sloppy, inefficient, lacking in business acumen and knowledge of government processes, or just a lot of extra bother; and (3) state and local contracting officers "in general" believe that MBEs cannot be relied on to perform but lack evidence in support of the belief. *Id.* at 21–22, 107.

For a number of reasons, the above information is, at best, weak evidence of prior discrimination by DOT or its recipients. The research is outdated, having been conducted between 1973 and 1975. *Id.* at VII. It is not limited to DOT contracting but apparently includes all federal agencies. The statistical validity or representativeness of the sample population is never discussed, and it is more anecdotal than statistical, with ambiguous generalizations such as "several," "a few," and "in general." A "feeling" by less than half of those interviewed is subject to the same criticism the Commission levels at the "belief" of state and local contracting officers —both are unsupported by any evidence.

Other "evidence" recited in Appendix II provides absolutely no support for an inference of prior discrimination by DOT or its recipients. Instead, the evidence is primarily of societal discrimination not traceable to DOT's actions and not included in the AADA's authorization of affirmative action by DOT. A few examples of such evidence, and brief analysis of each, follow:

1) Statistics on the disparity between the percentage of MBEs and their percentage share of gross business receipts for the nation, Appendix II at 2, are too broad to reveal anything about discrimination in the letting of DOT contracts;[18]

2) Statistics on the same disparity in the construction industry, *id.*, are similarly too broad;

3) Remarks by legislators attributing such disparities to discrimination, without supporting evidence and without specifying who was doing the discriminating, *id.*, at 5–6, establish only societal discrimination, not discrimination by DOT; and

4) "The operation of subtle forces"— such as a lack of equity capital, difficulty in securing financing, inability to obtain bonding, lack of adequate management and operational skills, and the state of the economy, *id.*, at 7–9—is, at most, a form of societal discrimination beyond DOT's competence or authority to address.

Third, the data referenced in the preambles to the May 17, 1979 NPRM and the March 31, 1980 final rule do not provide "a strong basis in evidence for [DOT's] conclusion that remedial action was necessary." The preambles contain only two arguably relevant statistics. One statistic reveals a disparity between the percentage of all businesses in the United States owned by minorities (three percent) and MBE participation in all DOT financial assistance (two percent in 1979, up from one percent in 1977). 45 Fed.Reg. at 21174 (final rule); 44 Fed.Reg. 28929 (NPRM). The second statistic reveals a disparity between the percentage of all businesses in the United States owned by MBEs (three percent) and the percentage of DOT grants going to MBEs in 1979 (MBEs received $360,456,000 of $13,300,000,000, or 2.7 percent). Statistical disparities may serve as circumstantial evidence of discrimination but cannot, standing alone, establish discrimination unless "the statistical evidence of racially disproportionate impact is so strong as to permit no inference other than that the results are the product of a racially discriminatory intent or purpose." *McCleskey v. Kemp,* 753 F.2d 877, 889 (11th Cir.1985), *cert. granted,* 478 U.S. 1019, 106 S.Ct. 3331, 92 L.Ed.2d 737 (1986). The disparities identified above simply are not so large that they preclude every inference other than that DOT or its recipients had discriminated in their contracting. Indeed, DOT itself identified a number of reasons, other than discrimination, for the disparities, including the financing, bonding, and experience problems discussed in connection with Appendix II. *See* 45 Fed.Reg. 28929.

---

**18.** As discussed in note 17, *supra,* the school board in *Wygant* relied on similarly mismatched statistics.

In addition to its reliance on the three categories of "findings" of discrimination discussed above, DOT points to the decision in *M.C. West*, 522 F.Supp. 338, as support for its argument that the MBE requirement is based on sufficient findings of prior discrimination. The court in *M.C. West* agreed with DOT that its MBE regulation was supported by adequate findings for two reasons. The first, that the "Notice and Comment adversary-like process ... is sufficient for an agency to make findings in support of its rule changes," *id.* at 347, has already been dealt with. *See* n. 15 and accompanying text *supra.*

The second reason given by the court in *M.C. West* was that "findings of discrimination by the Congress ... regarding other similar legislation" were a sufficient basis for DOT's MBE regulation. *Id.* at 349. The "other similar legislation" referred to was the Public Works Employment Act (PWEA) of 1977, 42 U.S.C. § 6701 *et seq.* The PWEA was upheld by the Supreme Court in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

At first glance, the result in *Fullilove* seems to favor DOT's argument that its findings in this case were sufficient, because Congress's findings in support of the PWEA were scanty. Justice Powell, in his concurring opinion in *Fullilove*, implied that the legislative history of the PWEA, standing alone, did not contain sufficient findings of prior discrimination. *Id.* at 502–03, 100 S.Ct. at 2787. However, because Congress is a legislative body, the Court looked beyond the legislative history of the particular act and examined "the total contemporary record of congressional action dealing with the problems of racial discrimination against minority business enterprises." *Id.* at 503, 100 S.Ct. at 2787.

DOT now argues essentially that Congress's scanty findings in support of the PWEA are also sufficient support for its own MBE regulation. The flaw in DOT's "if it's good enough for Congress, it's good enough for DOT" argument is that DOT is not Congress. DOT is an administrative agency whose authority is much more limited and whose procedures are subject to much more scrutiny than are the power and procedures of Congress. Three of the six majority justices in *Fullilove* repeatedly emphasized that their decision to uphold the PWEA was based in large part on two considerations: first, "the legislative authority of Congress" specifically delegated by the Constitution, particularly section five of the fourteenth amendment; and second, the electoral accountability of Congress as a "politically responsive branch[ ] of Government." *Id.* at 480, 490, 100 S.Ct. at 2776, 2781 (opinion of Burger, C.J.). The difference in authority and accountability between Congress and non-legislative bodies had direct bearing on the necessary extent of supporting findings: "Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or *administrative* proceedings." *Id.* at 478, 100 S.Ct. at 2774 (emphasis added).[19]

Justice Powell also recognized the distinction:

> Congress is not an adjudicatory body called upon to resolve specific disputes between competing adversaries. Its constitutional role is to be representative rather than impartial, to make policy rather than to apply settled principles of law.... The creation of national rules for the governance of our society simply does not entail the same concept of record making that is appropriate to a judicial or *administrative* proceeding.

*Id.* at 502, 100 S.Ct. at 2787 (emphasis supplied). In fact, Justice Powell explicitly noted that "the discriminatory activities [addressed by the PWEA] were not identified with the exactitude expected in judicial

---

**19.** The special authority of Congress, under section 5 of the fourteenth amendment, to remedy the effects of prior discrimination, also explains the absence in *Fullilove* of findings that *Congress* had engaged in prior discrimination. *Cf. Wygant*, 106 S.Ct. at 1847 (requiring "some showing of prior discrimination by the govern- mental unit involved"). Unlike administrative agencies and other non-elected governmental bodies with limited authority, Congress has the authority both to find and to remedy the constitutional or statutory violations of others. *See Bakke*, 438 U.S. at 307–10, 98 S.Ct. at 2757–59 (Opinion of Powell, J.).

or *administrative* adjudication." *Id.* at 506, 100 S.Ct. at 2789 (emphasis added). At another point, Justice Powell wrote,

> The degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body.

*Id.* at 515–16 n. 14, 100 S.Ct. at 2794 n. 14. Justice Powell concluded by reiterating that the result in *Fullilove* depended on Congress's unique status:

> [T]he issue here turns on the scope of congressional power, and Congress has been given a unique constitutional role in the enforcement of the post-Civil War Amendments.

*Id.* at 516, 100 S.Ct. at 2794.

Likewise, the Eleventh Circuit has noted the justices' emphasis on the nature of the governmental body adopting the affirmative action program:

> Both Chief Justice Burger and Justice Powell's opinions stress the fact that the statute in *Fullilove* was passed by Congress and should therefore be judged with deference to Congress' broad powers.... Their emphasis on the fact that the Court was reviewing a congressional statute suggests that constitutionally acceptable means of redressing past discrimination vary with the powers of the government body enacting the legislation.

*South Florida Chapter,* 723 F.2d at 851. *See also Central Alabama Paving,* 499 F.Supp. at 634 (declining to follow *Fullilove* and striking down DOT's MBE regulation because an agency, rather than Con-

gress, was requiring disparate treatment based on race).

The minimum teaching of *Fullilove* is that an agency's "findings" of prior discrimination must be at least somewhat more substantial than those made by Congress for the PWEA.[20] As the foregoing discussion makes clear, DOT's "findings" for the MBE regulation are no more substantial than were Congress's in *Fullilove.* Therefore, DOT has failed to establish a compelling governmental interest to justify its racial classification.[21]

### B. *Whether the Regulation is Narrowly Tailored.*

The Eleventh Circuit has formulated the "narrowly tailored" standard as follows:

> Legislation employing benign racial preferences ... must incorporate sufficient safeguards to allow a reviewing court to conclude that the program will be neither utilized to an extent nor continued in duration beyond the point needed to redress the effects of the past discrimination.... [T]he program must be structured in such a way that it is subject to reassessment and will be implemented in a manner that is flexible enough to account for changing needs and circumstances.

*Id.* at 852. The Supreme Court apparently has adopted a similar standard, which is discussed *infra,* at 1494–95.

Careful comparison of the affirmative action plans upheld by the Supreme Court in *Fullilove* and by the Eleventh Circuit in *South Florida Chapter* reveals critical, and constitutionally fatal, shortcomings in

---

**20.** *See* Note 53, U.Chi.L.Rev. at 618–20:
> There is less reason to defer to the agency because, unlike Congress, the agency does not have direct or co-equal authority to define constitutional violations. This difference between congressional and direct legislative authority suggests that more particularized findings should be required before agencies can adopt remedial plans.... Such findings could include specific identification of those who discriminated or were discriminated against, and might include detailed statistical information.

(Footnote omitted).

**21.** The following cases have upheld MBE programs imposed by state *legislative* bodies: *South Florida Chapter,* 723 F.2d 846 (11th Cir.1986) (county commission); *J.A. Croson Company,* 779 F.2d 181 (4th Cir.1985) (city council); *Associated General Contractors v. City and County of San Francisco,* 619 F.Supp. 334 (N.D.Cal.1985) (city and county board of supervisors); *Michigan Roadbuilders Association, Inc. v. Milliken,* 571 F.Supp. 173 (E.D.Mich.1983) (state legislature). *See also* cases cited in Note 53 U.Chi.L. Rev. at 594, notes 60–66.

the MBE regulation at issue here.[22] The MBE set aside in *Fullilove* shared certain characteristics with DOT's MBE regulation, including detailed definitions of MBEs that allow "weeding out" sham MBEs and a waiver where "best efforts" did not succeed in meeting the MBE goal. *Compare* 448 U.S. at 487–88, 100 S.Ct. at 2779–80 (Opinion of Burger, C.J.) *with* 49 C.F.R. § 23.53 and § 23.45(h)(2). But the MBE program in *Fullilove* went further than DOT's MBE regulation. *Fullilove*'s MBE program provided two additional assurances "that misapplications of the program [would] be promptly and adequately remedied administratively." *Id.* at 487, 100 S.Ct. at 2779. It provided an administrative complaint procedure for reporting "unjust participation" by enterprises that were not bona fide MBEs and provided for a special waiver "to avoid dealing with an MBE who was attempting to exploit the remedial aspects of the program by charging an unreasonable price, i.e., a price not attributable to the present effects of past discrimination." *Id.* at 488, 100 S.Ct. at 2780. DOT's MBE program provides neither safeguard.

Other characteristics of the MBE program in *Fullilove* provided additional "assurance that application of racial or ethnic criteria [would] be limited to accomplishing the remedial objectives of Congress." *Id.* at 487, 100 S.Ct. at 2779. First, the program's definition of an MBE was limited to "those whose competitive position is impaired by the effects of disadvantage and discrimination." *Id.* at 471, 100 S.Ct. at 2771 (Opinion of Burger, C.J.); *see also id.* at 487, 100 S.Ct. at 2779 (Congress's objective was to assure "legitimate participation by *disadvantaged* MBEs") (emphasis supplied). The MBE definition's insistence on minority status *and* disadvantage helped to ensure that the PWEA's MBE program was not over-inclusive, bestowing "a benefit on businesses identified by racial or ethnic criteria which cannot be justified on the basis of competitive criteria or as a remedy for the present effects of identified prior discrimination." *Id.* at 486, 100 S.Ct. at 2779.[23] Second, the program in *Fullilove* was "a pilot project, appropriately limited in extent and duration, and subject to reassessment and re-evaluation by the Congress prior to any extension or re-enactment." *Id.* at 489, 100 S.Ct. at 2780 (footnote omitted). The PWEA, enacted in May 1977, authorized $4 billion to fund "Round II" of the Economic Development Administration's program of grants to local public works projects. All of the federal money was to be committed to grantees by September 30, 1977. *Id.* at 511 n. 10, 100 S.Ct. at 2792 n. 10 (Powell, J., concurring). The PWEA's limited duration satisfied the justices' concern that "a race conscious program will not last longer than the discriminatory effects it is designed to eliminate." *Id.* at 513, 100 S.Ct. at 2792–93. *See also Local 28 of the Sheet Metal Workers' International Association v. EEOC*, 478 U.S. 421, 477, 106 S.Ct. 3019, 3051, 92 L.Ed. 2d 344 (1986) (court-ordered affirmative action plan scheduled to end as soon as the percentage of minority union members approximated the percentage of minorities in the local labor force).

By contrast, DOT's MBE regulation does not narrowly define MBEs to include only disadvantaged minority businesses. Nothing in the regulation would prevent the award of a subcontract to a firm owned by

---

**22.** It may be that an MBE goal or set-aside established by a non-legislative body (other than a court) can never be narrowly tailored enough to pass constitutional muster. *See Fullilove,* 448 U.S. at 515 n. 14, 100 S.Ct. at 2794 n. 14, where Justice Powell wrote:

My view that this set-aside is within the discretion of Congress does not imply that other methods are unavailable to Congress. Nor do I conclude that use of a set-aside always will be an appropriate remedy or that the selection of a set-aside by any other governmental body would be constitutional.

**23.** It seems to this court that requiring actual disadvantage is an essential ingredient in today's environment. Since the days of the civil rights struggles in the sixties two things at least have changed. First, many of the recipients are governed by "minorities," as is the case with Fulton County. Second, there are many more MBEs that are well financed and professionally accomplished. To insist, for example, that black leaders should give favor to well-situated black businessmen does infinitely more to legitimize cronyism that to remedy any vestigial effect of discrimination in some locales.

non-disadvantaged minorities, even if that firm's bid exceeded the bids of non-minority firms, so long as the firm's bid was lower than any other minority firms' bids. In fact, the regulation may require that result. The regulation is therefore over-inclusive in a way that the regulation at issue in *Fullilove* was not. While the over-inclusiveness, standing alone, may not invalidate the regulation, it is additional evidence that DOT's MBE regulation is not narrowly tailored.[24]

Also, DOT's MBE regulation has no durational limit and is subject to little or no re-evaluation by the agency or by Congress. The arguments of *amici curiae* the Progressive Alliance and the Joint Entrepreneurial Traders Association (PA/JETA) to the contrary are unpersuasive. The fact that the AADA implements an appropriations statute that must be reenacted periodically does not ensure sufficient congressional oversight of the MBE program. For one thing, the MBE program is not contained in the AADA itself but in a regulation that cites the AADA as one of several sources of authority. As a result, Congress is likely to debate only the appropriations statute, not the implementing statute and not the regulation that claims authorization under the implementing statute. Moreover, the period between enactments is substantially longer than was the case for the PWEA—the AADA was originally enacted in 1970; it was amended in 1976, in part to include a civil rights provision; and the AAIA was adopted in 1982 and is funded through October 1, 1987. *See* 26 U.S.C. § 9502(d)(1)(A).

The *amici's* argument that the regulation is subject to periodic review by DOT is disingenuous. *Amici* point to DOT's characterization of the April 27, 1981 final rule as an "interim" measure and its indication that it would later prepare a comprehensive revision of the entire MBE rule. *Amici* fail to point out, however, that DOT was describing as "interim" only its amendment to the contract award mechanism substituting the present "good faith effort" provisions for the "conclusive presumption" approach challenged in *Central Alabama Paving*, 499 F.Supp. 629. *Amici* also ignore the fact that almost six years after the April 27, 1981 final rule, no comprehensive revision has occurred.

Finally, *amici* PA/JETA argue that the regulation's provision for case-by-case exemptions, 49 C.F.R. § 233.41(f), assures adequate opportunity for reevaluation of the regulation. *Amici* offer no evidence on the frequency with which exemptions are requested or granted, nor do they offer any indication of what types of situations DOT will consider "exceptional" and therefore proper for exemption. In any event, it is clear that the exemption provision does not extend to wholesale revision of the MBE program.

The lack of adequate safeguards in DOT's MBE program is also illustrated by comparison with the MBE program upheld in *South Florida Chapter*. The county ordinance in *South Florida Chapter* required that any proposed MBE set aside or goal pass through three levels of administrative review, including the county manager, a three-member Contract Review Committee, and the board of county commissioners. 723 F.2d at 853. In addition, the board of county commissioners was required *annually* to "reassess the continuing desirability and viability of the program." *Id.* The county manager was required to monitor continually the program's use, to report its findings periodically, and to provide an annual report to the board for use in its annual review. *Id.*

---

**24.** DOT's definition of "minority" may itself be over-inclusive and not sufficiently narrowly tailored. Three justices in *Wygant* criticized a similar definition of minority:

> The Board's definition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent ... further illustrates the undifferentiated nature of the plan. There is no explanation of why the Board chose to favor these particular minorities or

how in fact members of some of the categories can be identified. Moreover, respondents have never suggested—much less formally found—that they have engaged in prior, purposeful discrimination against members of each of these minority groups.

106 S.Ct. at 1852 n. 13 (Opinion of Powell, J.). DOT's definition of minority is subject to substantially the same criticisms.

at 853–54. It is readily apparent that DOT's MBE program incorporates virtually no safeguards like those found in *South Florida Chapter.*

Because DOT's MBE program lacks "adequate assurances that the ... program will not be used to an extent nor continue in duration beyond the point necessary to redress the effects of past discrimination," *id.* at 854, it is not narrowly tailored to its stated objective and violates the equal protection component of the fifth amendment.

DOT's MBE regulation also fails to satisfy the "narrowly tailored" standard applied by a plurality of the Supreme Court in *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).[25] Justice Brennan described the standard as follows:

> In determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

*Id.* 480 U.S. at 171, 107 S.Ct. at 1067.

DOT's MBE regulation was not necessary to remedy the effects of prior discrimination by DOT. First, no such discrimination was ever established. *See supra,* at 1487–91. Second, any societal discrimination revealed by DOT's "findings" could be remedied just as effectively, if not more effectively, by other measures. For example, an MBE regulation does little to remove the barriers posed by "subtle forces" such as a lack of equity capital, difficulty in securing financing, inability to obtain bonding, and lack of adequate management and operational skills. *See supra,* at 1489. More effective measures would be targeted directly at the underlying causes, not merely the visible result, and might include vigorous enforcement of existing laws prohib-

iting discrimination in financing and bonding and the government provision of training in how to obtain government contracts. Agency-imposed discrimination bypasses the original problems and creates its own new problems, including encouraging citizens to classify themselves and others in terms of their race rather than their individual merit.

As discussed in detail earlier, the MBE regulation is not sufficiently flexible or of acceptable duration. The regulation does not compare any more favorably with the remedy approved in *Paradise* than with those approved in *Fullilove* and *South Florida Chapter.* The one-for-one promotion requirement in *Paradise* was sufficiently flexible primarily because its term of application was controlled by the Department of Public Safety against which it was imposed. 480 U.S. at 179, 107 S.Ct. at 1071. The requirement was to be enforced only until the Department adopted a nondiscriminatory system of promotions, something the Department had been enjoined to do and had promised to do. In its actual application, the requirement was suspended after one round of promotions. *Id.* The regulation at issue here does not approach the requirement in *Paradise* in terms of flexibility or duration.

The third and fourth factors in *Paradise* are of little significance in this case. The regulation does not itself set any numerical goals but instead requires recipients to "set goals that are practical and related to the potential availability of MBEs in desired areas of expertise." 49 Fed.Reg. § 23.45(g)(1). At least in its application, the regulation therefore requires the proper relationship between numerical goals and the relevant market.[26] The impact of the relief on the rights of third parties in this case is indistinguishable from that of the MBE program approved in *Fullilove,* which the Court held did not "impermissibly deprive[ ] non-minority businesses of

---

**25.** The standard was articulated by Justice Brennan in an opinion joined by three other Justices, citing previous opinions by a total of five Justices. 480 U.S. at 171, 107 S.Ct. at 1067.

**26.** It is still true, however, that in its *justification* (i.e., DOT's "findings") the regulation mismatches statistics. *See supra,* nn. 17–18.

access" to government contracting opportunities. 448 U.S. at 484, 100 S.Ct. at 2777.

Finally, there is some doubt that the goals provision is addressed at all to an identifiable residual effect of discrimination. As noted earlier, three percent of the nation's businesses were minority owned in 1979 and 2.7 percent of DOT funds went to MBEs that year. In the employment context it is doubtful if this level of disparity would be found sufficient to justify race-conscious hiring or promotion. *Compare United Steel Workers of America v. Weber*, 443 U.S. 193, 198–99, 99 S.Ct. 2721, 2724–25, 61 L.Ed.2d 480 (1979) (1.83 percent black employees where thirty-nine percent of work force in the area was black). In any event it seems clear that the goals would be dispensed with once parity was reached. *Weber*, 443 U.S. at 208–09, 99 S.Ct. at 2730; *Sheet Metal Workers*, 478 U.S. at 477, 106 S.Ct. at 3051. The same analysis is appropriate here. The aim of affirmative action in the employment cases is to put minorities into jobs and paths of advancement previously closed to them. The thought is that, with the passage of time and the continuation of affirmative outreach programs, stereotypes will be broken down and minorities will have equal opportunities for promotion. For an entrepreneur, goals and quotas should last only so long as necessary for those with venture capital to feel assured that backing an MBE is a risk not made unreasonable solely because of artificial barriers such as race or sex, long enough for today's would-be entrepreneurs to have some experience in the kind of work heretofore denied them, and long enough that the presence of MBEs in the field is not so rare as to be remarkable. Whether we have reached this point the court cannot say, but we have progressed sufficiently to say that the matter is not beyond debate. The DOT regulation ought to be monitoring concerns such as these in considering whether to continue the "goals" portion of its affirmative action program with every recipient or

at all. The regulation's failure to address these concerns is an additional reason that the regulation cannot be described as narrowly tailored.

## IV.  CONCLUSION.

In summary, DOT's MBE regulation is rooted in a grant of legislative authority by Congress, the AADA of 1976, and therefore would have the force and effect of law if it were constitutional. However, the regulation is unconstitutional because it violates the fifth amendment's equal protection component. First, the regulation is not justified by a compelling governmental interest. DOT lacked a strong basis in evidence for its conclusion that remedial action was necessary because the "findings" it relied on in developing the regulation do not even begin to demonstrate that DOT or its recipients had in the past discriminated in letting contracts. Second, even if the regulation is supported by adequate findings of prior discrimination, it is not narrowly tailored to remedy the effects of that discrimination. The regulation gives little assurance that it will not be misapplied and gives virtually no assurance that its operation will be limited to accomplishing its remedial objective.

For the foregoing reasons, the plaintiffs' motion for summary judgment on counts IX and X of their complaint is GRANTED. The federal defendants' motion for summary judgment on the same counts is DENIED.[27]

**27.**  The Supreme Court's recent decision in *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), has no application to these motions. *Johnson* decided "only the issue of the prohibitory scope of Title VII"; no constitutional issue was either raised or addressed in that case. *Id.* at 620 n. 2, 107 S.Ct. at 1446 n. 2.